COMMONWEALTH vs. ALBERT LEWIN.

Suffolk.  April 6, 1989. — August 14, 1989.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal*, Dismissal, Conduct of government agents, Disclosure of identity of informer. *Search and Seizure*, Affidavit. *Constitutional Law*, Conduct of government agents, Search and seizure.

The egregious misconduct, including perjury, of police officers in the prosecution of a defendant charged with first degree murder and other crimes, although condemned by this court in the strongest terms, was not shown either to be so prejudicial to the defendant's right to a fair trial as to warrant the dismissal of the indictments [582-584], or to require dismissal for prophylactic reasons [585-588]. LIACOS, C.J., dissenting, with whom ABRAMS, J., joined. ABRAMS, J., dissenting, with whom LIACOS, C.J., joined.

INDICTMENTS found and returned in the Superior Court Department on May 11, 1988.

A motion to dismiss was heard by *Charles M. Grabau*, J., and a motion for reconsideration was also heard by him.

*Michael J. Traft*, Special Assistant District Attorney (*Francis O'Meara, David B. Mark & Susan Underwood*, Assistant District Attorneys, with him) for the Commonwealth.

*Max D. Stern* (*Patricia Garin* with him) for the defendant.

*Andrew Good & Harvey Silverglate*, for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

WILKINS, J. This case involves perfidious Boston police officers whose perjurious and fraudulent conduct has threatened the Commonwealth's right to try the defendant for the murder of Detective Sherman C. Griffiths of the Boston police department. A Superior Court judge concluded that the indictments against the defendant had to be dismissed for failure of the Commonwealth to produce a witness whose testimony would

have aided the defense. The Commonwealth then sought reconsideration of the dismissals, presenting facts to the judge tending to show that the exculpatory witness in fact had never existed. The judge reconsidered his decision in light of the new disclosures and reaffirmed his decision to dismiss the indictments. Although we agree with the motion judge that the police engaged in egregious conduct, we conclude that the indictments should not have been dismissed.

Detective Griffiths was shot on February 17, 1988, while in the hallway of an apartment house at 102-104 Bellevue Street in the Dorchester section of Boston. He and other police officers were attempting to execute a search warrant. The building at 102-104 Bellevue Street contained two apartments on each of its three floors. Access among the apartments was available by means of front and rear stairways. The apartments on the left, facing the front of the building, were at 102 Bellevue Street; the apartments on the right were at 104 Bellevue Street.

*The application for the search warrant.* We start our unavoidably lengthy narrative of the facts and lower court proceedings with the application for the warrant to search the apartment on the third floor of 102 Bellevue Street.

On February 17, 1988, Officer Carlos A. Luna of the Boston police department applied for a search warrant to search "apt. #3 on the third floor" of 102 Bellevue Street. In that sworn application, Luna stated information he claimed to have received from "a reliable informant" referred to as "IT." In the course of this case, "IT" came to be described as John, and we shall continue the practice in this opinion. Luna represented that John had reported that he had recently been in the apartment on the third floor of 102 Bellevue Street, the home of an Hispanic male of medium build, five feet, six inches in height, in his thirties. John saw that man, whom he knew as Stevie, packaging cocaine in Massachusetts lottery receipts. According to Luna, John said that Stevie had rebuilt the door to the apartment "making it an extremely heavy door to break down," and that Stevie sold cocaine through a hole in the door without opening it.

Luna's application continued, stating that he himself had seen people knocking on the apartment door, pushing money through the door, and receiving folded paper back. He claimed that on February 15, 1988, he had made a purchase of cocaine through the door and had done so again on February 16, 1988, using official police department marked money.

As we shall see, Luna would later repudiate under oath his sworn representation that he made the drug purchases on February 15 and 16. He would similarly repudiate John as the source of any information presented in his application for the search warrant. We shall consider later the source of Luna's reference to and description of an Hispanic male named Stevie. The fact that on each of the two days preceding the death of Detective Griffiths an Hispanic male was selling drugs through the door of the apartment, if true, would prove that the defendant, a black Jamaican, was not the only person selling drugs from that location about the time of Griffiths's death.

*The attempt to execute the warrant; Griffiths's death.* At approximately 8 P.M. on February 17, 1988, members of the Boston police department drug control unit, including Officers Carlos Luna and Paul Schroeder and Detectives Sherman Griffiths and Hugo Amate, attempted to execute the warrant on the third floor at 102-104 Bellevue Street. Two officers remained outside the building to prevent any escape. As Griffiths was attempting with a sledgehammer to break down the door of the third-floor apartment at 104 Bellevue Street, shots were fired through the door from the inside. A bullet struck Griffiths in the head, killing him. Other officers forced the door open and found the apartment empty. The police searched the building. In the first floor apartment at 104 Bellevue Street they found seven adults: three blacks who lived in the apartment, two Hispanic males, one white male, and one black Jamaican male, the defendant.

*The probable cause hearing.* As a result of questioning the people found in the first-floor apartment and an investigation, the police charged the defendant with murder. Others were charged with various drug offenses. James McConnell, one of the occupants of the first-floor apartment, was also charged with

murder. A probable cause hearing was held in early March, 1988. The charges against persons other than the defendant were dismissed with the Commonwealth's assent in exchange for their cooperation.[1] Probable cause was found on the charges against the defendant.

Evidence presented at the probable cause hearing indicated that, shortly after noise of banging and shots was heard, the defendant, who was a drug dealer living alone on the third floor, entered the first-floor apartment. The defendant tried to give a gun to Shirley McConnell who refused to take it. He then gave it to James McConnell who put it under a mattress, where Officer Schroeder found it shortly thereafter. The gun had fired the bullet that killed Griffiths. There was evidence that the person who had sold drugs from the third-floor apartment before the defendant had was a Jamaican named Stevie.

Officer Schroeder testified on cross-examination that he had not participated in the investigation that had led to the issuance of the search warrant and that he had not been to 102-104 Bellevue Street before the day Griffiths was shot. Later in the course of this case, by affidavit Schroeder would in effect repudiate this testimony.

Officer Luna testified on questioning by the defendant that, on February 15, 1988, he went up to the third floor and said, "Stevie, I need one," placed $60 through the slot in the door, and received cocaine. He had heard that a person who went by the name Stevie sold drugs there. He believed that Stevie was an Hispanic. He went again on February 16, 1988, and made a second buy for $60. Three black males in the building saw him. One of them said that he thought he recognized Luna.

---

[1] The promises included dropping charges related to this case, protection and relocation for McConnell, for his wife Shirley, and for her brother, George Johnson, and assistance for some in connection with unrelated criminal matters. None of the witnesses was given immunity from prosecution in exchange for their testimony against the defendant, a conclusion that the Superior Court motion judge erroneously reached in a subsequent aspect of this proceeding. Each of the persons found in the first-floor apartment may still be charged with Griffiths's murder. The implication is, however, that they will not be charged if they truthfully cooperate with the prosecution.

Luna's informant John, who had been inside the apartment, provided the description of Stevie. Luna testified that he had remained in touch with John off and on and had met with him on February 15. As we shall see, based on the record in this case, substantially all this testimony from Luna is false or probably false.

*The motion for disclosure of the informant and dismissal of the indictments.* On May 11, 1988, a Suffolk County grand jury returned against the defendant one indictment charging murder, two indictments charging armed assault with intent to murder, two indictments charging assault with a dangerous weapon, and one indictment charging carrying a firearm without a license. On June 24, defense counsel moved for disclosure of the informant John's identity. On August 17, a judge in the Superior Court allowed the motion. The Commonwealth did not appeal from that order. On August 19, the defendant moved for an order directing the Commonwealth to produce the informant by a certain date. On September 22, the judge ordered that the Commonwealth produce the informant within two weeks. The Commonwealth did not do so, and, on October 20, 1988, the defendant moved to dismiss the indictments. A hearing on the motion was held in early December.

Luna, testifying at the hearing on the defendant's motion to dismiss, said that he relied on information from John in applying for the search warrant. John told Luna that the money and drugs were passed through a hole in a steel door at 102 Bellevue Street. John said that he had been in the apartment. John did not "make a buy" for Luna at the third-floor apartment.

Luna did not know John's full name, his address, his education, where he was born, where he came from, how long he had lived in Boston, who his friends were, or whether he had ever been arrested. John is not Hispanic. Luna described John's height, his weight, the color of his hair and skin, and approximate age. Luna also described various meetings he had had with John. Luna had spoken to John two days after the shooting and at various other times, including as recently as August 29, 1988.

Defense counsel's investigation uncovered thirty-one search warrants that Luna had obtained between June, 1987, and March, 1988, purportedly relying on information from John. From 1984 through March, 1988, John had been Luna's principal informant. Among other police officers, only the victim Griffiths had met John, as far as Luna knew. Luna had paid John at least $2,000 for information. John had given Luna information about drug operations in Roxbury, Dorchester, Jamaica Plain, Hyde Park, the South End, and East Boston.

The prosecutor asserts that, promptly after the judge's order to produce John, he told Luna to find John. On September 27, 1988, a deputy police superintendent ordered Luna to find John. Luna and other police officers then undertook to find him. Substantial time and expense went into the effort. Luna and Amate filed numerous written reports describing efforts to locate John. Luna testified during the hearing on the motion to dismiss the indictments that he had continued to look for John.

Sergeant Hugo Amate testified at the hearing on the motion to dismiss that he was Luna's supervisor. On September 27, on direction from his supervisor, he started looking for John. He believed he had met John only once, during the week before the shooting, when he was with Griffiths. Amate testified that he could not identify John but that John had said there was a man named Stevie who was doing the selling out of the third-floor apartment at 102 Bellevue Street. John thought Stevie, who looked black, was Puerto Rican because he spoke with an accent.

On February 22, 1989, the judge allowed the motion to dismiss.

*The disclosure of informant "X."* According to the prosecutor, shortly before the hearing on the defendant's motion to dismiss, he discovered from a review of the Boston police drug control unit's log of drug purchases that a controlled purchase of drugs had been made at 102 Bellevue Street on February 17, 1988, the day on which Griffiths was shot. The

person who made the purchase has been known as informant X in this proceeding.[2]

Informant X gave a recorded statement to the police on December 7, 1988. X stated that on February 17, 1988, between 8 P.M. and 8:30 P.M. Officer Luna had brought X to Bellevue Street to make a purchase of drugs for him. Luna gave X $60 and told X to go to the door on the right when X reached the third floor. On the third floor X saw three men whom X identified sometime later as the two Hispanic males and one of the black males who were arrested on the first floor of the building after Griffiths had been shot. No one answered a knock on the right-hand door. One of the men said that nothing was happening over there and that "[t]he happening is over here." X left the building but returned a few minutes later. X then saw the same three men being admitted to the apartment on the left. X made a purchase of cocaine, pushing money through a hole in the door of the left side apartment on urging from inside the apartment, spoken in Spanish, to push the money through. There was a hole about the size of a penny at eye level in the white metal door. X delivered the cocaine, which was wrapped in a Massachusetts lottery slip, to Luna.[3]

---

[2] The record contains no explanation why information about this purchase was not furnished to the defendant when the prosecutor disclosed the purchases on February 15 and 16, in response to the judge's order for disclosure of all drug purchases at 102-104 Bellevue Street.

[3] On March 1, 1989, on direction of the judge, defense counsel took the deposition of X in the presence of the prosecutor. During this deposition X testified to who the three men were, based on having seen pictures of them that had been published in a newspaper following Griffiths's death.

X's deposition testimony was generally consistent with, but in greater detail than, X's earlier statement. The man who admitted the three men into the third-floor apartment spoke both English and Spanish. X told Luna that Luna had sent X to the wrong door on the third floor. Apparently because of this information, the police officers sought to execute the search warrant at the third-floor apartment at 104, rather than, at 102 Bellevue Street.

In X's deposition, X was unsure of the time X had made the purchase of cocaine for Luna on February 17. X's testimony placed the purchase later than it appears to have occurred based on evidence as to the time of the shooting.

Not until January 3, 1989, did the prosecutor disclose to the court or to defense counsel the February 17 drug buy log entry or the existence of X. Because X claimed that Luna had directed X to the wrong door, the information X presented tended to undercut Luna's claim that he had made drug purchases at the third-floor apartment. In addition, and more important to the defendant, X's testimony was strongly exculpatory, because it placed persons other than the defendant in the third-floor apartment minutes before Griffiths's death. X played no part, however, in the judge's decision to dismiss the indictments, which we discuss next. We shall discuss later our view that the defendant has not shown that he was prejudiced by any delay in the disclosure of X and of the fact of X's February 17 drug purchase.

*The judge's memorandum of decision.* On February 22, 1989, the judge filed a thorough memorandum of decision explaining the factual and legal basis for his decision to allow the motion to dismiss the indictments. The judge recounted John's involvement in providing information concerning the cocaine business on the third floor of 102 Bellevue Street, Luna's casual interest in being able to locate John after Luna knew of the need to produce John in this case, and the circumstances of the fruitless search for John.

The judge concluded that John had material, exculpatory information. John had information that someone other than the defendant had been operating the cocaine business at 102 Bellevue Street on days just before Griffiths was shot. That information would tend to contradict the Commonwealth's theory that the defendant alone was operating a drug business on the third floor. The judge further concluded that Luna had intentionally failed to follow police procedures concerning the identification, supervision, and payment of informers. He recounted the extensive contact between Luna and John after Griffiths had been shot, including a meeting ten days after the August 19 order was entered requiring that John be identified. According to the judge's findings, for some reason, Luna appears not to have been advised of that order until September 1. The judge concluded that Luna had obstructed the ordered disclosure of

John. He ruled that the Commonwealth's failure to disclose the identity of John and to produce him "was due to deliberate and egregious inaction by the Commonwealth" and "resulted in irremediable harm to [the defendant]." He said that the Commonwealth had not proposed a measure less drastic than dismissal of the indictments as a cure for its prejudicial misconduct (see *Commonwealth* v. *Nelson*, 26 Mass. App. Ct. 794, 799-800 [1989]) and, therefore, he dismissed the indictments.

*The Commonwealth's motion for reconsideration.* On the same day that the order to dismiss the indictments was entered, the Commonwealth moved for a rehearing. In less than explicit terms, the motion suggested that the prosecutor had further facts about John and his "alleged" information that should be presented to the judge.

On February 27, the prosecutor first argued the motion for rehearing. He told the judge that he had located an informant, who has been called informant Y in this proceeding. Informant Y, the prosecutor said, appeared to be John, but Y's statement contradicted the testimony of Luna, of Amate, and, to some degree, of Schroeder. The prosecutor granted that Y could not be the person Luna had described as John. According to the prosecutor, Amate and Schroeder had accepted what informant Y had said, knew of him, could have brought him forward, but chose not to do so.[4] Also, they agreed that Luna did not make the drug purchase on February 15, 1988, but that Y had done so.

The prosecutor said that, based on X's statement about the wrong door, he had suspected Luna had not made a "buy" on the third floor. The judge ordered the prosecutor to present by March 3 an affidavit concerning the recent disclosures. He ordered Luna, Amate, and Schroeder, subject to any claim under the Fifth Amendment to the United States Constitution, to provide affidavits "as soon as they are available," and he planned to order the deposition of Y.

On March 3 the prosecutor filed his affidavit. After setting forth certain background facts concerning the search for John

---

[4] Luna was out of the country at the time Y was first uncovered and was not present at the February 27 hearing.

and his attempt to impress the police with the importance of finding John, the prosecutor said that, after the police had searched for John for three weeks, "I began to become convinced that either the informant did not exist or that the police were choosing not to produce him because he would contradict them." On February 9, the prosecutor received an anonymous telephone call in which he was given a name and an address. He received two further telephone calls on February 17. An investigation and search resulted in finding Y on February 24, and interviewing Y on the same day. Y's statement was taken on February 26, and a meeting was held that day at which Amate, Schroeder, their attorney, and others were present.

Also on March 3, the prosecutor disclosed that another informant, known as Z, had been located. Z's deposition was taken on March 6. Z's testimony is inconsistent in certain respects with information given by Y. Z said that Z had made the purchase on February 16. X's deposition had been held on March 1, and Y was deposed on March 8. The depositions and various exhibits were filed with the judge. We agree with the judge that, based on transcripts of the deposition testimony of Y and Z, their credibility is in serious question.

On March 21, 1989, the affidavits of the three police officers were docketed. The affidavits state sufficient facts under oath which, if true, demonstrate that at least Luna and Amate had made substantial misstatements of fact under oath during earlier portions of this proceeding, commencing with numerous lies in Luna's application for the search warrant for 102 Bellevue Street. In preparing these affidavits, all three officers were represented by counsel who advised them of the possible consequences of submitting the affidavits. Counsel represented to the motion judge that each officer intended to testify at any trial.

The affidavits presented the following facts. Schroeder arrested Y on February 9, 1988, for possession of controlled substances. Y offered to provide information concerning illegal sales of drugs in the Dorchester area. When Schroeder and Amate met Y on February 10, Y pointed out 102-104 Bellevue Street. Y tried unsuccessfully to purchase drugs there on that day. Y described the drug dealer, according to Schroeder, as "a

Hispanic male named either Stephen or Stevie." Amate stated that, when Y hesitated on being asked for a description of the seller, "I 'threw a description' at him." Y agreed that the person was "an Hispanic male, five feet six inches in height, named Stevie."

On February 15, 1988, Amate and Schroeder met again with Y who made a purchase of cocaine at 102-104 Bellevue Street. Y said that Y had passed money through a hole at eye level in a third-floor apartment door and that drugs had been passed back. On February 16, Luna and Amate supervised a controlled buy at 102-104 Bellevue Street by the confidential informant who has been called Z.

Luna swore that he had prepared the application for the search warrant based on information from Griffiths concerning Y's purchase on February 15, and his own information concerning Z's February 16 purchase. Luna swore that "[t]he affidavit was prepared based upon the collective information of my squad members and included information provided by only two civilian informants, Y and Z. I substituted myself as the drug purchaser in an effort to protect the confidential informants who had helped our investigation."

*The "denial" of the motion for rehearing.* On March 29, 1989, the judge purported to deny the Commonwealth's motion for reconsideration of the February 22 order dismissing the indictments. We think it is clear from the judge's memorandum and order, however, that in fact he did reconsider the defendant's motion to dismiss the indictments and concluded not to change his ruling. We thus consider the Commonwealth's appeal on the entire record. Cf. *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 229 (1973) (rulings on motion for new trial reached in judge's discretion may be argued on appeal). Because the motion judge did reconsider his decision, we need not decide whether he was obliged to reconsider his dismissal of the indictments.

The judge first noted that the prosecutor had disclosed that police officers involved in this case had given false testimony before the motion judge and in the District Court when they testified about John. He noted that the prosecutor's disclosures

called into question John's existence. "[The prosecutor's] reve-
lations lead to the inescapable conclusion that the officers fab-
ricated all information allegedly provided by John, including
the exculpatory information."[5] The judge noted that Luna,
Amate, and Schroeder knew of X and did not disclose X's
existence. The judge further commented that, although the
prosecutor knew of X in December, 1988, had some suggestion
of Y's existence by February 13, 1989, and in January and
February had "beg[u]n to become convinced" either that the
police were deliberately refusing to identify John or that John
did not exist, nevertheless on February 16 the prosecutor filed
proposed findings of fact urging the judge to find that the
failure to locate John was "not a bad faith failure." The judge
observed that, before his February 22 decision to dismiss the
indictments, the prosecutor did not inform the judge or defense
counsel of recent developments or of any belief that the officers
had committed perjury.

The judge recounted the discovery of Y and the prosecutor's
argument that, although Y had never been in the apartment,
Y was the real informant. He also recounted the discovery of Z.

The judge stated that he had ordered the prosecutor and the
three police officers to file affidavits by noon on March 3.
There is, however, nothing in any order or elsewhere in the
record to show that Luna, Amate, and Schroeder, who were
placed on paid administrative leave on February 27, were or-
dered to file affidavits by March 3.[6]

The judge made findings and reached conclusions about the
prosecutor's conduct. Although it is not clear whether miscon-
duct of the prosecutor himself was a basis for the judge's
refusal to reinstate the indictments (there was no such sugges-

_____

[5] In supplemental findings issued on the request of this court, the judge
disclaims this language as an expression of his conclusion that John never
existed but rather says it refers to the Commonwealth's arguments and
contentions.

[6] The judge's inference that, contrary to his order, the three officers waited
until after the depositions of X, Y, and Z had been taken before filing
affidavits consistent with that deposition testimony is not warranted on this
record. There is no showing that the officers saw or knew of the deposition
testimony of X, Y, or Z. The deposition testimony was impounded.

tion in the judge's initial decision to dismiss the indictments), the judge's negative criticism of the prosecutor's conduct must have had some purpose and may have provided some justification in his mind for the decision not to reinstate the indictments.

We conclude that the judge's criticisms of the prosecutor, even if warranted on the record, provide no basis for dismissal of the indictments. For example, if the prosecutor's delay until January, 1989, in the disclosure of X's existence (rather than disclosing X during the early December hearing on the defendant's motion to dismiss) was error, there is no basis for concluding that the defendant's rights have been prejudiced or that the error was egregious. The case can be tried now using X's testimony. The defendant has not shown how he will be adversely affected by any wrongful delay in the disclosure of X. No one suggests that X provided information on which the application for the warrant was based. The knowledge that X existed and of what X said X did does not suggest in any way that John did or did not exist. Moreover, X provides the defendant with exculpatory evidence.

We cannot fairly find fault with the prosecutor's decision to request, when he did, that the judge find that the search for John was not a bad faith failure. The prosecutor's ambiguous statement in his March 3 affidavit that in October, 1988, he "began to become convinced" either that the police were refusing to produce John because he would contradict them or that John did not exist is not a fair basis for criticizing the prosecutor for having maintained his position on the defendant's motion to dismiss. Although an inkling of doubt about the correctness of one's position can be the first step toward becoming convinced that one is wrong, such suspicion does not require that one abandon his position. Trial counsel, even prosecutors, are not required to be free from doubt about where the truth lies. When the prosecutor argued against the defendant's motion to dismiss the indictments, he was entitled to argue the good faith conduct of the police in seeking to find John.[7]

---

[7] As we have said, X's testimony concerning the door to which Luna sent him on February 17, 1988, which was the wrong door on the third floor of 102-104 Bellevue Street, strongly indicates that Luna did not make any

Of course, Luna's house of cards built in support of his application for the search warrant was beginning to collapse. The discovery of X, Y, and Z went a long way toward that collapse. In retrospect, it seems clear that the prosecutor should have asked the judge to delay any decision on the motion to dismiss the indictments while the prosecutor investigated the matter further. It also seems clear that, if the indictments had not been dismissed, Luna, Amate, and Schroeder would not have come forward to confess error as they did. The circumstances warrant no pride in the handling of this matter by the police. The question, however, is whether the indictments should have been dismissed.

The judge recognized the alternative principles requiring the dismissal of an indictment that we set forth in *Commonwealth* v. *Cronk*, 396 Mass. 194, 198-199 (1985). An indictment must be dismissed for prosecutorial misconduct upon a showing of irremediable harm to the defendant's opportunity to obtain a fair trial. *Id.* at 198. *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 314 (1984). "Under the alternative principle, prosecutorial misconduct that is egregious, deliberate, and intentional, or that results in a violation of constitutional rights may give rise to presumptive prejudice. In such instances prophylactic considerations may assume paramount importance and the 'drastic remedy' of dismissal of charges may become an appropriate remedy. *Commonwealth* v. *Light*, 394 Mass. [112, 114 (1985)], citing *Commonwealth* v. *Cinelli*, 389 Mass. 197, 210, cert. denied, 464 U.S. 860 (1983). *Commonwealth* v. *Manning*, 373 Mass. 438, 443-444 (1977)." *Commonwealth* v. *Cronk, supra* at 198-199.

---

purchase of drugs on the third floor on February 15 and 16, 1988. Disclosure of that fact would have made Luna a less credible witness, but that disclosure would have had no bearing on the existence or nonexistence of John. At the time he proposed findings of fact, the prosecutor did not know of the existence of evidence that John did not exist and that, therefore, the search for John was a sham. He was not required to abandon his position. See S.J.C. Rule 3:07, DR 7-103 (B), as appearing in 382 Mass. 784 (1982) ("A public prosecutor . . . shall make timely disclosure . . . of the existence of evidence, known to [him], that tends to negate the guilt of the accused . . . ."); S.J.C. Rule 3:08, PF 7 (a), as appearing in 382 Mass. 797 (1981).

The judge concluded that "the conduct of the prosecution team fell below required constitutional and ethical standards." He thought little of the credibility of Y and Z, a conclusion reasonably reached on the basis of their deposition testimony. He thought the affidavits of the three officers were also suspect.[8] The judge rightly attributed to the prosecutor the police officers' misconduct in the prosecution of the defendant. *Commonwealth v. Fontaine*, 402 Mass. 491, 496 n.9 (1988). He then concluded that: "The prosecution team has by its own admissions engaged in the falsification of police reports on many occasions, including the falsification of the affidavit in support of the search warrant for 102-104 Bellevue Street, intentional disregard for established police procedures and perjury before the District Court and the Superior Court. Additionally, *in the quest for the non-existent John*, public funds were needlessly expended. Finally, members of the prosecution team have intentionally used the court as a means to cover-up its own wrong doing which was not revealed until this court's dismissal of the above indictments" (emphasis supplied).[9] The judge concluded that dismissal of the indictments was required because the pattern of misconduct from the tragic death of Detective Griffiths to the present had been "pervasive, egregious, deliberate and intentional." He said that he could not assure that the "new" evidence was reliable or that the defendant could receive a fair trial.

*Postargument remand.* On March 30, 1989, a single justice of this court stayed the effectiveness of the order dismissing the indictments, and, on April 6, 1989, the Commonwealth's appeal was argued before the full court. The Commonwealth did not challenge the judge's reasoning in support of the initial

---

[8] As we shall explain shortly, the affidavits are not seriously suspect on the record before us in so far as they repudiate the existence of John.

[9] We shall return to the judge's, we think correct, conclusion on this record that John did not exist. Only if he did not exist would public funds have been "needlessly expended" in looking for John. In his supplemental findings, the judge did not comment on his earlier reference to the "non-existent John," although we noted that statement in our postargument order of remand.

order dismissing the indictments for failure to produce John but rather argued that, in light of disclosures since the February 22 order of dismissal, the dismissal was error. On April 12, 1989, the court remanded the case for prompt further findings as to whether the prosecutorial misconduct identified by the judge "prejudiced the defendant's right to a fair trial." [10]

The judge promptly filed supplementary findings. He briefly recited the background of the proceedings leading to his allowance of the motion to dismiss. He said that an evidentiary hearing on the Commonwealth's petition for a rehearing would have been futile. He reiterated his earlier finding that Y and Z were not a compilation of John. He found that John still exists and has been deliberately withheld. He ruled that the affidavits filed by the police officers lacked any indicia of reliability. He said that the Commonwealth had not satisfactorily explained (a) the source of the description of Stevie or (b) the source of the information in the search warrant that the door to the apartment at 102-104 Bellevue Street had been rebuilt. According to the judge, only a person who had been inside the apartment would know that the door had been rebuilt and X, Y, Z, and Luna all disclaimed having been inside the apartment.

As to prejudice, the judge reiterated his view that the nonproduction of John would prejudice the defendant. He found prejudice in the possibility of further prosecutorial misconduct

---

[10] We also said in the order: "This court has not concluded that, in the circumstances, the indictments could properly be dismissed only if the defendant, were he now to be tried, would be irremediably prejudiced by the Commonwealth's misconduct. We believe, however, that a decision in this appeal may be aided by further findings by the motion judge on that question. . . . If, as the judge has indicated, John (or at least his exculpatory evidence) never existed, the prejudice that supported the February 22, 1989, order may not exist.

"We seek specific findings as to how, if at all, the defendant's right to a fair trial has been irremediably prejudiced by the Commonwealth's misconduct. Such considerations would include whether there is any way, short of dismissal, by which the defendant's right to a fair trial can be preserved and whether the question of irremediable prejudice can be answered with reasonable certainty at this time (or whether it is premature to reach any conclusion on that question)."

and in his inability to assure that the prosecutor would act as a safeguard in the prosecution of these indictments so as not to taint the determination of guilt or innocence. He concluded that there was no alternative remedy to dismissal and that the failure to produce John and "the serious and calculated misconduct which is 'inextricably interwoven' with the facts and prosecution of this case, leads this court to conclude that the defendant cannot receive a fair trial."

*The nonexistence of John.* Earlier in this opinion we said that we disagree with the judge's finding that John exists and continues to be withheld. We now explain why that finding is clearly erroneous on the record in this case. Luna's testimony that John provided information leading to applications for search warrants in almost all parts of the city portrays an informant with a remarkable (perhaps one should say incredible) range of knowledge. The careful investigatory work of defense counsel uncovered thirty-one applications for search warrants in various parts of the city in which Luna relied on John during just a ten-month period.[11] To perpetuate his lie, Luna apparently felt compelled to describe John as the peripatetic savant of illicit drug activity in the city of Boston the applications portrayed. One reasonable implication from Luna's testimony is that Luna made up John as a means of obtaining search warrants in ostensible compliance with constitutional requirements concerning the issuance of search warrants.

Whether this inference appropriately should have been drawn from Luna's testimony is not particularly important in light of the three officers' sworn repudiation of the existence of John and of various other facts previously stated under oath. The officers' affidavits were produced in circumstances strongly supporting their accuracy. Each officer, represented by counsel, made a sworn statement admitting to perjury after having been advised by counsel of the consequences of his action. In

---

[11] At the hearing on the motion to dismiss, after the defendant had brought out Luna's extensive use of John as an informant, the judge inquired of defense counsel, "Are you suggesting that John never existed?" Defense counsel answered, "No."

admitting to perjury, each officer was virtually assuring the end of his career as a Boston police officer and was providing a basis for serious criminal charges against himself, including a charge of criminal contempt of court. In these circumstances, the incentive to lie at that time about the nonexistence of John as a source of information was virtually nonexistent. There is no apparent reason why any of these officers would untruthfully deny John's existence and by doing so seriously incriminate himself, destroy his career, and damage his reputation.

We do not know for certain, of course, that John does not exist. We do say, however, that on this record a finding that John does exist was clearly erroneous. We, therefore, accept the judge's initial determination, made when he first denied the motion to reconsider dismissal of the indictments, that John is "non-existent."

*Prejudice.* We had hoped that on remand the judge would clarify the question whether there would be prejudice to the defendant if John did not exist and the case were tried. In light of his supplemental findings, we construe the judge's statement that he cannot assure that the defendant can receive a fair trial to be based not on any demonstrated, irremediable prejudice (assuming John to be nonexistent) but rather on the premise that the egregious prosecutorial misconduct itself requires dismissal. We shall treat the issue of egregious misconduct later. But first we must consider the question of prejudice further.

In his supplemental findings, the judge refers to certain information set forth in Luna's application for a search warrant that he believed remained unexplained. The judge says that the source of the information about Stevie and the source of the information about the "rebuilt" door has not been disclosed. As to the suggestion that only a person who had been in the apartment would know the door had been rebuilt, we agree with the Commonwealth that, based on a photograph of the outside of the door that is in the record, a person on the outside of the door could tell that the door frame had been rebuilt.

There remains the possibility that Luna, or one of the other police officers, received information from some source that has not yet been disclosed concerning the rebuilt door and con-

cerning an Hispanic male called Stevie who was seen selling drugs in the apartment on the two days before Griffiths's death. See *Brady* v. *Maryland*, 373 U.S. 83 (1963). The defendant is entitled to have a voir dire hearing on these questions before trial in order to establish the present position of Luna and Amate concerning the origin of the information about Stevie and the door. If the defendant wishes, he may introduce at trial such portions of Luna's application for the search warrant as he wishes, and the Commonwealth will be barred from rebutting any portion of the application so admitted. The defendant shall be entitled to bring out as much of the perfidious conduct of the police in this matter as he wishes, even though all or some of that misconduct may not be strictly material to the trial of the charges against the defendant. The trial judge may devise other means of protecting the defendant's rights in the face of the police misconduct.

We are unable to conclude that, in these circumstances, the defendant cannot receive a fair trial. Perhaps when the trial is over, if there are convictions, the possibility of unfairness will be demonstrable. X's testimony concerning identifiable men, other than the defendant, being on the third floor just before Griffiths's death and the unwillingness of Luna, Amate, and perhaps others to disclose X's existence will present a strong basis for an argument that no finding beyond a reasonable doubt is warranted that the defendant, alone in the apartment, shot Griffiths. Information, if it exists, that an Hispanic male named Stevie was actually seen in the apartment on the two prior days, although relevant, seems substantially less important than the testimony of X and the delay in X's disclosure. The defendant has not yet demonstrated that his right to a fair trial has been irremediably prejudiced because exculpatory evidence has been withheld, thus warranting dismissal of the indictments.

As to the prospect of future prosecutorial misconduct (a point that concerned the motion judge), we decline to assume that the subsequent prosecution of this case will be tainted by new misconduct.

*Egregious misconduct.* The police misconduct in this case does not warrant the dismissal of the serious charges, including murder, pending against the defendant. That misconduct deserves direct censure, condemnation, and punishment. At this time at least, however, society need not punish itself by dismissing the charges.

Perjurious police conduct is reprehensible. Luna's knowingly false application for the search warrant completely discredits a fundamental safeguard on which constitutional protection against unreasonable searches and seizures is based. Our system tests the existence of probable cause to conduct a search based on information from an unnamed informant by considering the information that a police officer gave under oath to the magistrate who issued the search warrant. The validity of the process depends on belief in the integrity of affiant police officers. For a defendant to be entitled to go behind the police officer's application to show that in fact there was no probable cause to justify issuance of the warrant, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks* v. *Delaware*, 438 U.S. 154, 155 (1978). See *Commonwealth* v. *Nine Hundred & Ninety-two Dollars*, 383 Mass. 764, 767 (1981). A substantial showing of such a false statement is not easily made. Lies about the existence of an undisclosed informant and his reliability are easy to tell yet most difficult to uncover.

There is no constitutional requirement that the existence of probable cause to issue a warrant be tested, as has been the practice, solely on the facts contained in an affidavit in support of its issuance. Where a lack of integrity has been shown in a portion of the drug control unit of a police department, judicial confidence is shaken in the use of warrant applications alone to test probable cause. This case shows that some police officers will lie and will lie further in an effort to cover up the initial lie. Where established police procedures for the internal disclosure of informants have been disregarded, judicial confidence is further shaken. It is vital that the demonstrated omissions

be corrected and that supervisory authorities insist on the protection of the constitutional and other rights of all persons.

This is not at all a case of an overzealous defense attorney relying on technicalities to exonerate a client. This is a case in which defense counsel has carried out his responsibilities as he should and, in doing so, has uncovered contemptible and disgusting misconduct by police officers in blatant violation of their sworn duties. Their criminal and reprehensible behavior intrudes on the constitutional rights of us all by undermining the integrity of our system of constitutional protections and by making a mockery of their oaths to tell the truth.[12]

Although we condemn the police misconduct in this case in the strongest terms and would have required the suppression of any evidence of drug law violations seized during a search pursuant to the search warrant, the charges against the defendant need not be dismissed because of egregious police misconduct. We have sometimes remarked that outrageous police conduct, not shown to be prejudicial to a fair trial, may require the dismissal of charges, but we have never dismissed charges in such a circumstance (although we have upheld the suppression of evidence in such situations). See *Commonwealth* v. *Fontaine*, 402 Mass. 491, 498 (1988); *Commonwealth* v. *King*, 400 Mass. 283, 290 (1987); *Commonwealth* v. *Light*, 394 Mass. 112, 114-115 (1985); *Commonwealth* v. *Cinelli*, 389 Mass. 197, 207-211, cert. denied, 464 U.S. 860 (1983). Cf. *Commonwealth* v. *Cronk*, 396 Mass. 194, 199 (1985) (prosecutorial misconduct).[13]

---

[12] Some centralized consideration by administrative justices or the chief administrative justice of the scope of police misconduct in seeking search warrants and the adequacy of police procedures for guarding against such misconduct may be needed. Judges must zealously guard themselves against being used by police officers who lie and who violate constitutional rights in order to achieve what they improperly perceive as the greater end of convicting other wrongdoers.

[13] In *Commonwealth* v. *Manning*, 373 Mass. 438, 444 (1977), where law enforcement officers wilfully interfered with the defendant's right to counsel, we ordered the indictments dismissed because "the defendant had in fact been prejudiced to some extent." *Id.* at 443. The prejudice, however, was found not to be "serious." The *Manning* case may stand for the application of a strict standard in cases where intentional, egregious conduct threatens a

The only reason to dismiss criminal charges because of non-prejudicial but egregious police misconduct would be to create a climate adverse to repetition of that misconduct that would not otherwise exist. In this case, the police misconduct was directed initially at arresting the person or persons involved in a drug vending operation on the third floor of 102-104 Bellevue Street. If Luna, Amate, and Schroeder had made a clean breast of their misconduct immediately after Griffiths was shot, there certainly would have been no conduct so egregious as to require dismissal of charges against the defendant.

The officers' attempts to cover up their misconduct were not designed to aid in the conviction of the defendant of murder and other crimes and in fact may have seriously hampered, rather than aided, proof of the defendant's guilt. The police perjury and cover-up were not entwined in proof of the charges against the defendant but rather concerned a largely separate matter (illicit drug dealing) that, to be sure, may have some connection with proof of the defendant's guilt. These acts do not require dismissal of the charges for prophylactic reasons.

Repetition of such conduct by others will be sufficiently discouraged without dismissal of the charges. The officers' police careers are over, their reputations are greatly damaged, and they face serious criminal charges. Knowledge of these adverse consequences to the police officers should be a deterrent to similar future misconduct.[14] A properly constructed and diligently supervised police department procedure for monitoring and controlling the content of applications for search warrants based on information from undisclosed informants should also provide a deterrent to misconduct, provided it is endorsed by responsible superiors and contains provisions for discipline

---

defendant's constitutional right to counsel. See *Commonwealth* v. *Hine*, 393 Mass. 564, 571-572 (1984). That right is not at issue in this case.

[14] This case is unlike one involving an illegal search and seizure in which the threat of a claim by the accused criminal defendant against the wrongdoer officer has little potential for deterrence and exclusion of the illegally seized evidence has been adopted as a prophylactic solution to the police wrongdoing.

when prescribed procedures are not followed. It is now apparent, moreover, that judges can and will dismiss even serious indictments if the police do not come forward with information that must be disclosed. The likelihood that misconduct of the type involved in this case will not be uncovered, unless the dismissal of charges is assured when one is caught in such wrongdoing, is not so great as to require dismissal of the indictments in this case in order to encourage earlier disclosure of wrongdoing in future cases. "In the absence of a demonstrated need for deterrence, a prophylactic remedy is inappropriate." *Commonwealth* v. *King*, 400 Mass. 283, 292 (1987).

In order to express its outrage at the reprehensible police conduct in this case, society need not punish itself by freeing a man who may be guilty of murder in the first degree and other serious crimes. If the defendant can receive a fair trial in spite of the police misconduct, a matter that cannot be determined with total confidence at this time, that misconduct provides no reason to dismiss the charges in this case.

The order dismissing the indictments is vacated, and the case is remanded to the Superior Court for trial.[15]

*So ordered.*

LIACOS, C.J. (dissenting, with whom Abrams, J., joins). In a case riddled with deceit and fraud by law enforcement authorities, the court, ignoring the realities of the meaning of a fair trial, contents itself by reciting indignant, but toothless rhetoric. The court describes the conduct of those who would put the defendant on trial and who hold the cards against him as "perfidious," "contemptible," "disgusting," "criminal," and "in blatant violation of their sworn duties," yet denies the defendant an effective remedy. Without the ultimate sanction of dismissal with prejudice, this court fails "to discourage government agents from such deliberate and insidious attempts

---

[15] The motion judge has acknowledged that, if the indictments are reinstated, he will not be the trial judge.

to subvert the defendant's right to a fair trial." *Commonwealth* v. *Jackson*, 391 Mass. 749, 754 (1984).

The prosecutorial team's "egregious, deliberate, and intentional" misconduct far exceeds that required to establish presumptive prejudice. *Commonwealth* v. *Cronk*, 396 Mass. 194, 199 (1985). "[T]he officers' misconduct was so pervasive as to preclude any confident assumption that proceedings at . . . trial would be free of the taint." *Commonwealth* v. *Manning*, 373 Mass. 438, 444 (1977). Sadly, these proceedings have been poisoned beyond cure solely by the agents of the Commonwealth. Truth and falsehood have become so obscured in this case, at the instigation of the prosecutorial team, that it is impossible to believe that the defendant will be able to obtain a fair trial.[1] See *Commonwealth* v. *Lam Hue To*, 391 Mass.

---

[1] I take exception to the court's willingness to exonerate the prosecutor by characterizing his strong suspicions of wrongdoing as "an inkling of doubt about the correctness of [his] position." *Ante* at 578. While the prosecutor did not create the initial problems, as early as October, 1988, after "an intensive unsuccessful search for the informant [he] began to become convinced that either the informant did not exist or that the police were choosing not to produce him because he would contradict them." The prosecutor's suspicions were such that in December, 1988, January, and February, 1989, he "implor[ed] each police officer to call [him] anonymously and give [him] the answer either he does not exist or he does and this is his identity." Said the prosecutor in his affidavit: "Throughout this same December, 1988, to February, 1989 period, I continued over and over to try to impress Sergeant Amate and Detective Luna that if my suspicions were accurate they should tell the truth." All the while, the prosecutor mentioned none of this to the judge. Indeed, the prosecutor went so far as to submit a proposed finding of fact which recited that Luna's "failure to find John . . . is not a bad faith failure." Only when the indictments were dismissed — indeed, on the very day that the indictments were dismissed — did the prosecutor disclose to the judge the misconduct committed by the police officers. Such conduct appears to fall below the standards set by our rules of professional responsibility. See S.J.C. Rule 3:07, DR 7-103 (B), as appearing in 382 Mass. 784 (1982): "A public prosecutor . . . in criminal litigation shall make timely disclosure to counsel for the defendant . . . of the existence of evidence, known to the prosecutor . . . that tends to negate the guilt of the accused." See S.J.C. Rule 3:08, PF 7, and PF 12, as appearing in 382 Mass. 797 (1982). Standard PF 12, provides in part: "It is unprofessional conduct for a prosecutor [to] . . . fail to seek withdrawal [of false evidence] *promptly* upon discovery of its falsity" (emphasis supplied).

301, 312-313 (1984). The court should not turn a blind eye to the serious degradation of the truth-seeking process, in the hopes that somehow a jury will be able to sort out the whole mess.[2] I "see no place in due process law for positioning the jury to weed out the seeds of untruth planted by the government." *United States* v. *Waterman,* 732 F.2d 1527, 1532 (8th Cir. 1984), cert. denied, 471 U.S. 1065 (1985).

The court today, in its newfound role as fact finder, substitutes its view of events for that of the judge, riding roughshod over accepted standards of appellate review. There is considerable evidence to support the judge's finding of fact that there is an undisclosed exculpatory witness. The police have shown that they will do everything within their power to ensure the conviction of the defendant. They failed for months to disclose the existence of informant X. The officers have never offered any explanation for this delay, nor would revelation of X have contradicted any previous sworn statements. In fact, despite the judge's disclosure order, the police officers never voluntarily revealed the information. Even after dismissal, when the police supposedly "came clean," they presented two alleged informants — whom they had purportedly been withholding for almost a year — whose testimony the motion judge found to be unworthy of belief. Yet now the court would have us believe that witnesses who have repeatedly misled the court finally are telling the truth, and that they no longer have an incentive to lie. This is sheer nonsense. The very fact that the police officers have already put themselves at personal risk increases their incentive to say anything that would get the defendant convicted. They now have every reason to conceal an exculpatory witness: revealing him now would make their misguided sacrifice of the truth and the Constitution all for naught.

---

[2] Apparently, the court is willing to perpetrate a fraud on the jury. It will allow the defendant to introduce the statements about John and Stevie which the court insists are false, and will bar the Commonwealth from rebutting that evidence. Under the court's analysis, the result will give the jury the false impression that John does exist.

At any rate, these considerations regarding credibility should all properly remain within the province of the lower court. See *Commonwealth* v. *Hine*, 393 Mass. 564, 568 (1984). The judge below saw these police officers testify in prior proceedings. He, not this court, should determine whether their belated recantation is to be believed. *Commonwealth* v. *Carballo*, 9 Mass. App. Ct. 57, 60, *S.C.,* 381 Mass. 227 (1980). *Commonwealth* v. *Grace*, 397 Mass. 303, 310-311 (1986). The court today boldly substitutes its own judgment as to credibility for that of the judge, claiming that it is incredible that the informant John could have provided information which led to applications for over thirty search warrants.[3]

In addition, the court takes great pains to reconstruct a scenario in which the informant John did not necessarily exist. For instance, the court makes much of the fact that a person outside the apartment could tell that the door had been rebuilt. But this type of analysis misconstrues the role of appellate courts. Although we may have found the facts differently, we may not substitute our judgment for that of the motion judge. "We have often stated that '[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court.' " *Commonwealth* v. *Hine, supra* at 568. *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). The judge had before him sufficient evidence to warrant a finding that John exists.[4]

The court, in its rush to send the defendant to trial, brushes aside well-established principles against relitigation of facts

---

[3] I doubt the court would rule in a later case that an affidavit which relies on an informant who supplied information which led to thirty warrants is invalid on its face.

[4] The court unfairly mischaracterizes an isolated statement of the judge, characterizing it as an "initial determination." The judge stated: "[I]n the quest for the non-existent John, public funds were needlessly expended." The Commonwealth claimed that John did not exist. Yet the police officers submitted detailed reports and received overtime compensation during the search for someone they now represent as nonexistent. The judge's sarcastic statement regarding this reprehensible activity was far from a "finding" that John was nonexistent.

after final judgments.[5] This court has said, with regard to defendants in criminal cases, "[t]he defendant may not, after losing on one theory, retry his case on an alternate theory on which admissible, highly relevant evidence was available to him at the time of the trial." *Commonwealth* v. *Freiberg, ante* 282, 288 (1989). Apparently, a different standard applies to the Commonwealth. This is not a rule of law; it is a sleight of hand, and a slight to the defendant's right to a fair trial.

This case has undermined the public's faith in the administration of justice in this Commonwealth. The court today has done nothing to restore confidence in our now sullied system of justice.[6] The saddest aspect of this entire sordid saga of police misconduct may well be that the death of a police officer will go unavenged. Let it be known that the cause of such an event is not the court but the police themselves.

ABRAMS, J. (dissenting, with whom Liacos, C.J., joins). The court today substitutes rhetoric for precedent in order to reinstate the indictments against Lewin. We have said that, "[a] trial judge . . . must rest a dismissal of criminal charges for failure of the prosecution to comply with discovery orders in a timely manner on findings that the delayed disclosure was due to deliberate and egregious action by the prosecutor *or* unintentional conduct resulting in irremediable harm to the defendant" (emphasis added). *Commonwealth* v. *Cronk,* 396

---

[5] The court disregards the procedural posture of the case, choosing to view the Commonwealth's appeal on the entire record. For the controversial proposition that this court may view the case on the whole record and not solely with respect to the motion for reconsideration the court cites *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 229 (1973). That case is no authority for the court's proposition. *McLaughlin* stands for the uncontroversial proposition that a trial judge's rulings of *law* may be reviewed by appellate courts. That case says nothing about relitigation and review of factual determinations.

[6] I think it appropriate to note the careful, thorough, and conscientious treatment with which the judge in this case handled this particularly difficult and sensitive matter. He has shown courage; we would have done well to follow his example.

Mass. 194, 199 (1985). The court now alters this standard by requiring not only deliberate and egregious conduct to justify dismissal of criminal indictments but also irremediable harm to the defendant. Adherence to the principles of stare decisis provides certainty in the law. The only thing now certain is that no matter how egregious the government conduct, courts of the Commonwealth will do no more than give lip service to protect citizens from unlawful, illegal, and intentional prosecutorial misconduct.

To reach its result, the court finds facts, not the usual function of an appellate court. On remand, the judge found that "John exists and has deliberately been withheld." It is a "well-established principle of appellate review that subsidiary findings of fact by the judge below will be accepted absent clear error." *Commonwealth* v. *Hine*, 393 Mass. 564, 568 (1984). The court purports to discover clear error in the judge's finding that John exists.[1] The court is wrong: there is ample evidence to warrant a determination that John exists. The police officers all testified (before their attempted recantation) that John exists. As long as the judge found the initial testimony more credible than the attempted recantation, he is warranted in concluding that John exists. The judge saw the witnesses testify, and the members of this court did not. The judge found that the officers' initial testimony was more credible than their abandonment of the testimony, and that John exists. Until today, we always have "accept[ed] the judge's resolution of conflicting testimony." *Commonwealth* v. *Sanchez*, 403 Mass. 640, 644 n.3 (1988). "We have often stated that '[t]he determination of the weight

---

[1] The court also claims that the judge in his findings of fact before remand clearly concluded that John does not exist. The court's implication is that the judge was wrong when he told this court that he finds that John exists. The court's disingenuous characterization of the judge's words "the non-existent John" in his initial findings as a "determination" does not bear close scrutiny. In that portion of the opinion, the judge was sarcastically describing the amount of money spent on a bogus search for a man named John the Commonwealth now *claims* does not exist.

If it is so clear from the judge's first findings and from the other evidence that John does not exist, why did the court find it necessary to remand to the motion judge?

and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court.' " *Commonwealth* v. *Hine*, *supra*, quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). See *Commonwealth* v. *Cronk*, *supra* at 199. Although this is an elementary principle of judicial review, the court fails to follow it.

The court reverses the judge's credibility determinations by making its own determination of credibility. To bolster its conclusion, the court states that the officers have no incentive to continue to lie. This is not established. Nothing in the court's opinion suggests that the Commonwealth *must* prosecute the "perjurious" officers. Nothing in the court's opinion suggests that the defendant's conviction might be contingent on prosecution of the officers and that failure to prosecute the officers may constitute presumptive prejudice to the defendant. At present, therefore, the police officers have every incentive to continue to lie. They may hope not to be prosecuted or to be treated more leniently if they provide evidence at trial which aids the Commonwealth. The court is naive to assume otherwise.

Assuming for the moment that the court is warranted in finding that the judge's conclusion that John exists is clearly erroneous, the court still exceeds the scope of proper appellate review.[2] Even assuming that there is no evidence to warrant a finding that John exists, that does not provide the court with any proof that John does not exist. *Commonwealth* v. *Michaud*, 389 Mass. 491, 498 (1983). *Commonwealth* v. *Eramo*, 377 Mass. 912, 913 n.1 (1979). *Commonwealth* v. *Marino*, 343 Mass. 725, 728 (1962) (disbelief of evidence is not sufficient

---

[2] The court does not explicitly announce a rule for determining whether a defendant has proved prejudice. Nevertheless, the court seems to set an extremely high standard of proof, and requires a defendant to prove prejudice with certainty, not only to the motion judge but to the appellate court. It is difficult for a defendant definitively to prove that exculpatory evidence exists somewhere in the world if this evidence is not in his possession. Further, even if he proves this to the satisfaction of the motion judge, under the court's analysis, the police can merely present a plausible alternate explanation and thereby avoid the dictates of *Commonwealth* v. *Cronk*, *supra*.

to establish opposite conclusion). Thus, the court's conclusion that John does not exist is flawed. Further, the officers have not been ordered to come forward with the witnesses who provided the detailed composite of Stevie. The failure to establish how the description was obtained raises serious doubt about whether the Commonwealth has turned over to the defendant all its exculpatory evidence. The police misconduct therefore has clouded this case so thoroughly "as to preclude any confident assumption that proceedings at a . . . trial would be free of the taint." *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 313 (1984), quoting *Commonwealth* v. *Manning*, 373 Mass. 438, 444 (1977).[3]

The behavior of the police officers was intolerably exploitive of Lewin, who, being held in jail in lieu of bail, attempted to prepare for his impending trial.[4] The officers lied about John in connection with the drug charges, and continued to lie about him as John became a focal point in the murder case. Because of the officers' lies, the defendant languished in jail while court proceedings continued with what the court has characterized as "perfidious" police conduct. The defendant's attorney has had continuously to revise his trial strategy in the face of new revelations from the police. The Commonwealth claimed that there was an informant it called John, and the defendant was expected to try his case in response to this theory. Now the court rules that the Commonwealth need not adhere to its initial claim but may try its case under another, different strategy. The defendant is left with a Hobson's choice — go to trial without adequate preparation or remain in jail preparing

[3] At most, under the court's analysis there is no evidence one way or the other whether John exists. Nevertheless, the court is willing to mislead the jury (whose role it is to determine the truth) by allowing the defendant to present unrebutted testimony that John (whom the court concludes does not exist) exists. Thus, according to the court, the jury's verdict will not "speak the truth," as the word "verdict" means.

[4] As the fruitless search for the "non-existent" John wasted the assets of the Commonwealth, the police misconduct also has wasted the assets of the defendant by forcing him to undergo prolonged court proceedings and to investigate a case which is different from the Commonwealth's original case.

his defense. Surely this alone may constitute "irremediable harm to the defendant's opportunity to obtain a fair trial," *Commonwealth* v. *Cronk, supra* at 198.

The officers admitted their lies and their perjury only when the judge dismissed the indictments. At that point, police came forward with Y and Z, whom the judge found incredible and whom the court seems to agree were incredible. Under today's decision, members of the police force may continue lying until indictments are dismissed, and then be entitled to reinstatement as soon as they come forward with any type of explanation. Essentially, the court has placed the police in the enviable situation of "heads I win, tails you lose." The court's holding certainly provides no disincentive (other than the usual fears of the penalties of perjury, which apparently meant little in this case at least) for the police officers to lie to bolster their position regarding the indictments.[5]

Finally, assuming for the sake of argument, that the court is justified in its new found power to find facts, and we may be confident that John does not exist, in my view, the judge acted correctly in dismissing the indictments as a prophylactic measure to deter serious police misconduct. In this case, "[w]e are confronted . . . not with the proverbial constable's blunder or even the good faith overzealousness in the pursuit of legitimate law enforcement aims." *Commonwealth* v. *Manning, supra* at 443. Rather, this is a case of "egregious, deliberate,

---

[5] Although implying that the trial judge may take certain measures protective of the defendant, the court provides little in the way of guidance as to how to protect the defendant from an unfair trial. May the judge preclude the police officers from testifying? May he preclude Y and Z from testifying? May the trial judge disqualify this particular prosecutor? May he preclude arguments from the Commonwealth on the credibility of its witnesses? May he limit the number of peremptory challenges available to the Commonwealth? May he require the Commonwealth to provide a written copy of its final arguments in advance? May he eliminate the Commonwealth's final argument? May the judge permit the defendant to argue last? May the judge instruct the jury to scrutinize the Commonwealth's witnesses' testimony with great care? The court's brief discussion of not allowing the Commonwealth to rebut evidence of the existence of John is inadequate guidance.

If the judge takes these actions, may the Commonwealth complain to the full court each time he rules adversely to the Commonwealth?

and intentional" police misconduct. *Commonwealth* v. *Cronk,* *supra* at 198. The court's tepid response leaves me with great doubt "that such conduct will not be tolerated in our criminal justice system." *Commonwealth* v. *Manning, supra,* at 445. The court's decision not only tolerates but encourages illegality on the part of the police and discourages judges in the pursuit of truth and justice. I continue to adhere to my view that, in circumstances in which the misconduct is so "outrageous, egregious, and calculated. . . . I would dismiss the indictments against the defendant without a showing of prejudice." *Commonwealth* v. *King,* 400 Mass. 283, 294-295 (1987) (Abrams, J., dissenting). See *Commonwealth* v. *Light,* 394 Mass. 112, 115 (1985) (Liacos, J., dissenting).

The police officers have done their very best to hide the truth from the defendant and the courts. The court today has done nothing to aid the discovery of the truth. "[W]hen the truth is buried underground, it grows, it chokes, it gathers such an explosive force that on the day when it bursts out, it blows everything up with it. We shall soon see whether we have not laid the mines for a most far-reaching disaster of the near future." Zola, J'Accuse! (1898), reprinted in The Law as Literature (London ed. 1960). I dissent.