COMMONWEALTH vs. CHRISTOPHER KING.

Bristol.  September 11, 1986. — June 16, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal,* Dismissal, Assistance of counsel, Conduct of govern-
ment agents. *Constitutional Law,* Conduct of government agents, Assist-
ance of counsel.

At a hearing on a motion to dismiss indictments on the ground that improper
police surveillance of the defendant's discussions with his attorneys and
that improper and unauthorized police visits and interrogation attempts
while the defendant was held in custody impaired the defendant's right
to effective assistance of counsel, the judge's finding that the defendant
was not actually prejudiced in his defense was supported by ample
evidence. [287-288]
No substantial threat of prejudice to a criminal defendant's right to effective
assistance of counsel appeared, notwithstanding an improper attempt by
police to intercept and record conversations between the defendant and
his attorneys, in the circumstances of a case in which the defendant had
no defense to the indictments. [288-290]
Police misconduct, which was not designed to prejudice a criminal defend-
ant, nor engaged in by any prosecutor, and which, under the unique
circumstances of his case, was nonprejudicial to the defendant, did not
require dismissal, as a prophylactic measure, of the indictments pending
against the defendant at the time of the misconduct. [290-292] ABRAMS,
J., with whom LIACOS, J. joins, dissenting.

INDICTMENTS found and returned in the Superior Court De-
partment on February 17, 1982.

A motion to dismiss was heard by *Guy Volterra,* J., and the
cases were heard by him.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*William M. Kunstler* of New York for the defendant.

*Dana A. Curhan,* Assistant District Attorney, for the Com-
monwealth.

O'CONNOR, J. The defendant appeals from convictions, after a jury-waived trial, on a charge of unlawfully carrying a firearm without a license, and on three charges of unlawfully carrying a firearm under his control in a motor vehicle, G. L. c. 269, § 10 (*a*). The defendant was also convicted on four counts of concealing a firearm with an obliterated serial number, G. L. c. 269, § 11C, but those convictions were placed on file, and are not on appeal. The defendant argues that the trial judge erred in denying his pretrial motion to dismiss the relevant indictments on account of egregious misconduct on the part of the Massachusetts State police. We affirm the convictions.

We quote the judge's findings in connection with the motion to dismiss.

"1. On February 7, 1982, Massachusetts State Police Trooper Paul Landry was on routine patrol south bound on interstate Route 95 in the town of North Attleborough. Trooper Landry drove into the rest area which was located in this sector of his patrol. He spotted a green station wagon with two men sitting in the front seat. Upon further investigation, Trooper Landry conducted a license and registration check of Christopher King and his associate, Jaan Laaman. At the same time, Trooper Landry requested a back-up unit, and Trooper Michael Crosby responded to this request.

"2. Upon Trooper Crosby's arrival, Trooper Landry conducted a routine patdown of King which revealed a bullet-proof vest and a firearm. At the same time, Laaman alighted from the vehicle and fired three shots at the Troopers; who returned fire. Laaman fled on foot into the woods behind the Route 95 rest area. The Troopers arrested King and conducted a search of the station wagon which revealed a variety of firearms, ammunitions, narcotics, and a Doberman Pinscher.

"3. On February 26, 1982, the New Jersey State Police arrested Allan Berube for possession of a concealed weapon. Since 1978, Berube had been out of jail and on parole from his 1963 convictions in Federal Courts for bank robberies in Los Angeles, California, and Asheville, North Carolina. . . . Following his arrest on the weapon charge Berube contacted the New Jersey State Police on March 27, 1982. Berube knew

that the police sought the killers of New Jersey State Trooper Phillip Lamonica. He told the New Jersey State Police that he was acquainted with the defendant and some of the defendant's associates who were suspected of being involved in the killing of Lamonica. He offered to lead the police to these individuals in return for the dismissal of the pending firearm charges and assistance with the federal authorities in respect to his scheduled parole revocation hearing. After Berube had made this offer the New Jersey authorities administered two polygraph tests which Berube failed. Nevertheless, the police task force which had been assembled to attempt to apprehend these killers instructed Berube to infiltrate himself among the 'Cambridge community' where the defendant, Christopher King once associated himself.

"4. In preparation for this visit, the task force supplied Berube with a sophisticated electronic recording device. Berube was instructed to seek the whereabouts of King's associates, Thomas Manning and Richard Williams.

"5. On March 28, 1982, the police task force arranged for Berube's entrance into the Bristol County House of Correction where King was incarcerated pending trial. Berube was instructed to obtain King's confidence and determine the whereabouts of Manning and Williams. Berube secured entrance into the jail and spoke with the defendant King for approximately ninety minutes.

"6. Following Berube's first meeting with the defendant King, he met with the task force at the [Massachusetts] State Police barracks in Dartmouth for a debriefing session. At the direction of Thomas Evans of the New Jersey State Police, Massachusetts Trooper John Sorbera recorded this meeting and shortly thereafter transcribed it. No other recordings or notes were made at subsequent police debriefings.

"7. On or about April 3, 1982, Berube visited King for a second time at the request of the New Jersey State Police. . . . The task force instructed Berube to 'wear down' King by emphasizing that the Cambridge community did not support him. Berube testified that he had been instructed by the police to disparage King's attorneys by pointing out to King that the

attorneys were doing nothing in his behalf. I specifically find that Berube's testimony on this issue is not credible. The credible evidence is that King himself told Berube that he was dissatisfied with his attorneys, and that he had attempted to discharge them.

"8. On or about June 5, 1982, Berube made his final visit to King at the Bristol County House of Correction. The police task force instructed Berube to concoct a story which might trick King into revealing the whereabouts of Manning and Williams. Berube told King that he was planning a bank robbery which would net $280,000, but that he needed help from people experienced in this activity. According to Berube the defendant King did not reveal the whereabouts of Manning and Williams through this ruse. Again the police debriefed Berube.

"9. On April 14, 1982, Berube met with members of the police task force in Boston where they equipped him with an operative envelope style electronic transmitter. He was instructed to place this device in his brief case and attend the defendant's motion to suppress hearing in the Bristol County Superior Court at New Bedford. . . . Berube entered the court house and spent time with King's lawyers in the court house and court house corridors. During a recess Berube placed himself and the brief case which contained the electronic recording device near the holding cell during an attorney-client conference between King and his attorneys. The lawyers observing Berube near them in the holding cell informed Berube that the conference was confidential and instructed Berube to leave. Berube left but he placed the brief case near the holding cell in an attempt to overhear these private and confidential conversations between King and his lawyers. Subsequently Berube retrieved the brief case and then placed the brief case near the defense table so that conversations between King and his lawyers could be intercepted during the course of the hearing. There was evidence offered by the Commonwealth during the course of the hearing before me that batteries had not been placed in the envelope style electronic transmitter because the police officers involved in this investigation knew that it was illegal to engage in electronic surveillance within the court house. I find these assertions not credible.

"10. Sometime in the spring of 1982, Trooper O'Connor of the Massachusetts State Police visited King at the Bristol County House of Correction without the consent of King's attorneys even though he knew that King was represented by counsel. During this visit O'Connor offered King reward money for information relating to the whereabouts of Manning and Williams. Subsequent to this visit, which developed nothing for the police, King began to refuse to see visitors that he did not know. As a result, Major Coe of the New Jersey State Police met with King under false pretenses by asserting to the jail authorities that he was King's attorney. After meeting Coe King refused to cooperate with him.

"11. At no time during the course of the investigation which was being performed by this syndicate of police officers charged with apprehending the fugitives Manning and Williams did the Bristol County District Attorney's office or the officers of the Massachusetts State Police which were charged with prosecuting King for these indictments have any knowledge of the task force activity or of the methods that were being used in that investigation. I specifically find that neither the Bristol County District Attorney's office nor the investigating police officers involved in these indictments violated the defendant's right to the effective assistance of counsel."

The judge concluded that, considering all the circumstances, King had not been prejudiced. Following the lead of *United States* v. *Morrison,* 449 U.S. 361, 364-365 (1981), the judge concluded that, because there was no prejudice, dismissal of the indictments was inappropriate. Therefore, he denied the defendant's motion to dismiss. The only issue on appeal is whether that ruling was correct.

There was ample evidence to support the judge's finding that neither the police nor Berube had disparaged King's counsel or otherwise impaired King's relationship with counsel. The judge also was warranted in finding that none of the team prosecuting King was involved in, or knew about, the improper surveillance of King's discussions with counsel, or the visits to King at the Bristol County house of correction. Therefore, the judge's finding of no prejudice to the defendant, which

addressed the period up to the hearing on the motion to dismiss, must stand.

The judge did not address the question whether the possibility that, after the hearing on the motion but before trial, the police would disclose to the prosecutor information gained by the electronic surveillance of King's conferences with his attorney, presented a substantial threat of prejudice. It is appropriate that we do so. The judge disbelieved that batteries had not been placed in the electronic transmitter. Even if, favorably to the defendant, we treat the judge's expression of disbelief as a finding that King's conferences with his attorney were in fact intercepted and recorded, we nevertheless are satisfied that, in the circumstances of this case, there was no threat of prejudice to the defendant.

In other circumstances, the failure of the police to make available to the court tape recordings of confidential attorney-client conferences might raise a substantial question whether the defendant could be tried fairly. Surely, whenever the government's case is fairly debatable, the government's discovery of the defendant's planned trial strategy by electronic interception could result in irreparable harm to the defendant. *State* v. *Sugar,* 84 N.J. 1, 18-19 (1980), *S.C.,* 100 N.J. 214 (1985).[1] In such a case, if the government were unable or unwilling to produce the tape recordings, we would be reluctant to place on the defendant, as a prerequisite to dismissal, the burden of proving that the recordings contained prejudicial material. See *Matter of Kozak,* 256 N.W.2d 717, 724 (S.D. 1977).

In this case, however, the defendant was caught redhanded. No attorney, no matter how bright, imaginative, or resourceful, could have devised a trial strategy with the slightest potential for yielding the defendant an acquittal of the various gun charges against him. Defense counsel was only being realistic when he told the judge during the hearing on the motion to dismiss that, unless the defendant prevailed on his motion to

[1] The discovery of evidence or witnesses through electronic interception of attorney-client conferences, on the other hand, can be remedied by exclusion of the tainted fruits of the interception. *State* v. *Sugar, supra* at 21, 25-26.

dismiss or on his motion to suppress,[2] the defendant would have no defense and there would be no point in "trying a case which surely would result in a conviction." Consistent with that evaluation of the case, a stipulation, signed by the defendant and witnessed by counsel, was thereafter entered in evidence at trial. The stipulation is reproduced in the margin.[3]

---

[2] The defendant's motion to suppress already had been denied, and that ruling had been affirmed by this court. *Commonwealth* v. *King*, 389 Mass. 233 (1983).

[3] "I, Christopher King, the defendant in Indictment Nos. 9931-9937 do hereby stipulate and agree that as to Indictment No. 9933, Count #1, I, on or about the seventh day of February in the year of our Lord one thousand nine hundred and eighty-two, at North Attleboro, in the County of Bristol aforesaid, did receive a firearm, to wit: a 9mm pistol, with knowledge that its serial number or identification number has been removed, defaced, altered, obliterated or mutilated; Count #2, That I on or about the seventh day of February in the year of our Lord one thousand nine hundred and eighty-two, at North Attleboro, in the County of Bristol aforesaid, did receive a firearm, to wit: a .380 automatic pistol, with knowledge that its serial number or identification number has been removed, defaced, altered, obliterated or mutilated; Count #3, That I on or about the seventh day of February in the year of our Lord one thousand nine hundred and eighty-two, at North Attleboro, in the County of Bristol aforesaid, did receive a .45 caliber carbine, with knowledge that its serial number or identification number has been removed, defaced, altered, obliterated or mutilated; Count #4, That I on or about the seventh day of February in the year of our Lord one thousand nine hundred and eighty-two, at North Attleboro, in the County of Bristol aforesaid, did receive an Ithaca pump shotgun, with knowledge that its serial number or identification number has been removed, defaced, altered, obliterated or mutilated.

"I further stipulate and agree that as to Indictment No. 9936, that I on or about the seventh day of February in the year of our Lord one thousand nine hundred and eighty-two, at North Attleboro, in the County of Bristol aforesaid, did unlawfully carry on my person a certain firearm, to wit: a 9mm pistol, without having then and there any license, authority, appointment, permission, according to law, so to do.

"I further stipulate and agree that as to Indictment No. 9937, Count #1, that I on or about the seventh day of February in the year of our Lord one thousand nine hundred and eighty-two, at North Attleboro, in the County of Bristol aforesaid, did unlawfully carry a .380 automatic pistol, under my control in a certain motor vehicle, to wit: an automobile, without having then and there any license, authority, appointment or permission, according to law, so to do; Count #2, that I on or about the seventh day of February in the year of our Lord one thousand nine hundred and eighty-two, at North Attleboro, in the County of Bristol aforesaid, did unlawfully carry a .45 caliber carbine, under my control in a certain motor vehicle to wit: an

The facts of this case, then, make it abundantly clear that the Commonwealth could have learned nothing from the taped conversation that would have assisted the prosecution or detracted from the defense of these indictments in any way.

Therefore, we must consider whether, in the absence of prejudice to the defendant or substantial threat thereof, dismissal of these indictments is nevertheless required for prophylactic reasons. Of course, our inquiry in that regard begins with the recognition that the public has a substantial interest in prosecuting those accused of crime and bringing the guilty to justice. See *Commonwealth* v. *Cronk,* 396 Mass. 194, 199 (1985); *Commonwealth* v. *Cinelli,* 389 Mass. 197, 210, cert. denied, 464 U.S. 860 (1983); *Commonwealth* v. *Carlson,* 17 Mass. App. Ct. 52, 57 (1983). See also *Three Juveniles* v. *Commonwealth,* 390 Mass. 357, 359, 364 (1983), cert. denied, 465 U.S. 1068 (1984).

In recent cases this court has suggested in dicta and without discussion that egregious prosecutorial misconduct, not resulting in prejudice to the defendant, might in some circumstances warrant dismissal of indictments. See *Commonwealth* v. *Cronk, supra* at 198-199; *Commonwealth* v. *Light,* 394 Mass. 112, 114 (1985); *Commonwealth* v. *Cinelli, supra* at 207-211. However, we have never ordered the dismissal of an indictment for misconduct in the absence of prejudice. In *Commonwealth* v. *Manning,* 373 Mass. 438 (1977), the prosecution team disparaged defense counsel in conversation with the defendant, *id.* at 440, and thereby violated the defendant's constitutional right to counsel. *Id.* at 442. The court stated, "As a general rule, 'any violation of a constitutional right gives rise to presumptive prejudice, which normally requires a reversal of the conviction, in the absence of an affirmative showing by the

automobile, without having then and there any license, authority, appointment or permission, according to law, so to do; Count #3, that I on or about the seventh day of February in the year of our Lord one thousand nine hundred and eighty-two, at North Attleboro, in the County of Bristol aforesaid, did unlawfully carry an Ithaca pump shotgun, under my control in a certain motor vehicle, to wit: an automobile, without having then and there any license, authority, appointment or permission according to law, so to do."

Commonwealth that the error was harmless.' *Commonwealth v. McDonald (No. 1)*, 368 Mass. 395, 399 (1975). In the case now before us, we need not invoke a presumption of prejudice, as implicit in the motion judge's finding that there had been no 'serious' impairment of the attorney-client relationship is a finding that the defendant had in fact been prejudiced to some extent." *Id.* at 442-443. The court concluded: "It may be that the only way to prevent such offensive and deliberate manipulation of criminal defendants is to formulate a per se rule which would mandate the dismissal of an indictment in cases in which government agents intentionally attempt to subvert the attorney-client relationship and the defendant's right to a fair trial. In the case now before us, we find it unnecessary to adopt such a rule. The indictment itself is so inextricably interwoven with the misconduct which preceded it that the only appropriate remedy here is to dismiss the indictment." *Id.* at 444.

In *Manning,* the court did not announce a per se rule that egregious prosecutorial misconduct without prejudice requires dismissal. The court subsequently made that clear when it said in *Commonwealth* v. *Hine,* 393 Mass. 564, 571 (1984), "Contrary to the defendant's contentions, *Manning* did not establish a per se rule mandating the dismissal of indictments where government agents have intentionally violated a defendant's rights. *Id.* at 444. . . . We ordered the exceptional remedy of dismissal because the defendant 'had in fact been prejudiced to some extent' by the impairment of his right to the assistance of counsel *and 'the officers' misconduct was so pervasive as to preclude any confident assumption that proceedings at a new trial could be free of the taint.' Id.* at 443-444" (emphasis added). See *Commonwealth* v. *Lam Hue To,* 391 Mass. 301, 312-313 (1984) ("Whether an indictment should be dismissed upon the defendant's motion where the prosecution has acted improperly, turns primarily on the ability of the defendant to obtain a fair trial after, and in light of, the impropriety").

"[O]ur courts should not adopt prophylactic remedies for police misconduct which needlessly frustrate law enforcement and the public interest in that sphere. Our emphasis has always been that any remedy should be tailored to cure the prejudice

to the defendant. . . . Because judicial responses should be limited to truly remedial, and not punitive, measures, the absolute necessity for integrity in law enforcement recommends, in appropriate cases, recourse to civil remedies and departmental police discipline." *Commonwealth* v. *Hine, supra* at 573. The Federal rule is that an indictment should not be dismissed for egregious prosecutorial misconduct in the absence of prejudice or a substantial threat thereof. *United States* v. *Morrison,* 449 U.S. 361, 364-365 (1981). See *United States* v. *King,* 753 F.2d 1 (1st Cir. 1985) (indictments arising out of same incidents as in this case).

It may be that, in the absence of prejudice or substantial threat of prejudice, an indictment should never be dismissed.[4] We need not decide that question. It is enough for our decision in this unique case that we recognize that, not only was the police misconduct here nonprejudicial to the defendant, but also it was neither designed to prejudice him nor was it engaged in by anyone belonging to the prosecution team. Nothing in the record suggests, nor is there good reason to suppose, that, unless this court provides a prophylactic remedy, police officers are likely to repeat the type of conduct that occurred in this case. In the absence of a demonstrated need for deterrence, a prophylactic remedy is inappropriate.

*Judgments affirmed.*

ABRAMS, J. (dissenting, with whom Liacos, J., joins). At oral argument, the Commonwealth conceded that "[t]here is

---

[4] Surely, it is fairly arguable that a rule calling for the dismissal of an indictment despite lack of prejudice or threat thereof is not necessary to deter police misconduct because, in the usual course, a police officer's only motive to engage in misconduct is to prejudice the defendant. If those few officers who contemplate such conduct are made to realize that, should their misconduct indeed result in the prejudice they seek, or a substantial threat thereof, they will have lost their case, no greater deterrent message need be delivered. Such an argument would hold that any further deterrence that might be accomplished by a per se rule requiring dismissal is minimal, and does not justify the high price society would pay for it.

no question that the conduct of certain officers from the task force was both outrageous and inexcusable." Thus, the sole question is whether such outrageous and inexcusable conduct falls within the principles we set out in *Commonwealth* v. *Manning*, 373 Mass. 438 (1977). In this case, as in *Manning*, "[w]e are confronted . . . not with the proverbial constable's blunder or even with good faith overzealousness in the pursuit of legitimate law enforcement aims. Rather, we have here a deliberate and intentional attack by [Massachusetts] agents on the relationship between [the defendant] and his counsel." *Id*. at 443. Although we said "we wish to leave no doubt that such conduct will not be tolerated in our criminal justice system," *id*. at 445, today's decision not only departs from those principles but also condones criminal conduct by the State police.

The State police task force members used Berube to try to obtain the defendant's confidence and to elicit information from the defendant in at least two separate postindictment interviews, in clear violation of *Massiah* v. *United States*, 377 U.S. 201 (1964). See *Commonwealth* v. *Cote*, 386 Mass. 354, 360 (1982); *Commonwealth* v. *McCarthy*, 348 Mass. 7, 11 (1964). Task force officers themselves made repeated, unauthorized visits to the defendant. At no time did the State police officers ask permission of the defendant or of his counsel to visit with him or to interrogate him about unrelated matters. The State police officers gave Berube a briefcase equipped with an electronic surveillance device and told him to attend the defendant's motion to suppress hearing and to tape record conversations between the defendant and his attorneys. The Commonwealth alleges that the State police officers did not put batteries in the electronic transmitter. The judge, as the court notes, *ante* at 288, disbelieved the Commonwealth's explanation.[1]

---

[1] The State police did not obtain an electronic eavesdropping warrant, and violated G. L. c. 272, § 99 C 1. See *Commonwealth* v. *Blood, ante* 61, 67 (1987). On the record before us, the Commonwealth has not made any effort to prosecute the officers involved, even for attempted violation of G. L. c. 272, § 99. The likelihood of such a prosecution diminishes as a result of the court's decision.

The court's decision also encourages the police to continue to act irresponsibly and illegally by justifying its result because the conduct "was . . . [not] engaged in by anyone belonging to the prosecution team." *Ante* at 292. Now, a police agency can do what it wants as long as it does not tell the prosecutor.[2]

The conduct in this case, when measured "against the misconduct shown in other cases . . . in recent years," *Commonwealth* v. *Light,* 394 Mass. 112, 115 (1985), is far more outrageous, egregious, and calculated. Cf. *Commonwealth* v. *Cronk,* 396 Mass. 194 (1985) (Commonwealth's failure to comply with discovery orders not sufficiently egregious); *Commonwealth* v. *Light, supra* at 115 (no indication that Commonwealth's failure to turn over paint test results to defendant in motor vehicle collision was intentional misconduct; retrial ordered); *Commonwealth* v. *Cinelli,* 389 Mass. 197, 207-210, cert. denied, 464 U.S. 860 (1983) (single incident of improper postarraignment interview not sufficiently egregious nor of the requisite degree of "deliberateness" and "calculation" to warrant dismissal). The involvement of Massachusetts State police in the illegal conduct is clear. They engaged in the misconduct to further law enforcement goals. As members of the task force, Massachusetts authorities arranged Berube's meetings with the defendant, met with Berube during the debriefing sessions that followed the interviews, and equipped Berube with the electronic recording device used at the motion to suppress hearing. The State police "have the burden of 'letting the left hand know what the right hand is doing' or has done," *Santobello* v. *New York,* 404 U.S. 257, 262 (1971), and the State police as a whole must be held accountable for the misconduct.

"The specific misconduct present in this case is particularly troublesome because only when the importunings of government agents are unsuccessful will the matter come to the attention of the courts." *Manning, supra* at 444. In refusing to dismiss the indictments against King, the court today fulfils

---

[2] Or, more accurately, as long as a defendant is unable to prove knowledge on the part of the prosecutor.

its own prophecy and becomes "the instrumentality through which government agents may effectuate threats to defendants regarding the consequences of asserting constitutional rights." *Id.* at 444.

The behavior of the State police officers in this case was intolerably exploitive and coercive against a person held in lieu of bail. I would dismiss the indictments against the defendant without a showing of prejudice.[3] I dissent.

[3] I think the court's statement in note 4, *ante* at 292, that "it is fairly arguable that a rule calling for the dismissal of an indictment despite lack of prejudice or threat thereof is not necessary to deter police misconduct because, in the usual course, a police officer's only motive to engage in misconduct is to prejudice the defendant" is naive. Certainly, gathering information from defendants about other criminal suspects is a strong police motive. The court's decision ignores that motive and allows the police free rein to pursue these interests as long as they do not inform the prosecutor of their intended misconduct.