## Commonwealth *vs.* Joseph L. Druce.

Worcester. November 6, 2008. - April 27, 2009.

Present: Marshall, C.J., Ireland, Cowin, Cordy, & Botsford, JJ.

*Homicide. Constitutional Law,* Assistance of counsel. *Due Process of Law,*
Assistance of counsel. *Practice, Criminal,* Capital case, Assistance of
counsel, Fair trial, Motion to suppress, Voluntariness of confession, Mistrial,
Medication of defendant during trial, New trial. *Fair Trial. Evidence,* Vol-
untariness of statement.

A Superior Court judge properly denied the criminal defendant's motion to
dismiss, brought on the ground that the Department of Correction had
interfered with the defendant's rights to counsel, due process, and a fair
trial, where, although the judge clearly was concerned about some of the
defendant's allegations, the evidence of prejudice to the defendant was
insufficient to warrant a dismissal. [693-697]

A Superior Court judge properly denied the criminal defendant's motion to
suppress two statements that he gave to law enforcement officers, where
the judge, in concluding that the defendant had made one statement without
prodding, acted within his responsibility in resolving conflicting testimony,
and where the record supported the judge's conclusion that the defendant
was capable of understanding the consequences of his waiver of his Miranda
rights, was sufficiently in control of his faculties, and was able voluntarily
to waive those rights and make voluntary statements. [697-700]

The criminal defendant failed to satisfy his burden of demonstrating that a
Superior Court judge abused his discretion in denying the defendant's mo-
tion for a mistrial based on the Department of Correction's (department's)
alleged failure adequately to medicate the defendant during his trial, strip
search of the defendant, and search of the defendant's papers; moreover,
the defendant failed to demonstrate prejudice arising from his inability to
sleep on the night before his second day of testimony, due to observation
by department personnel, or from his arrival in court with bruising and
swelling around his eye, which he used to inform the jury of his abuse at
the hands of the department. [700-702]

A Superior Court judge did not err in denying the criminal defendant's pro se
motion for a new trial, in which the defendant claimed ineffective assistance
of counsel, where the defendant did not meet his burden of showing that
substantial conduct or omission by his counsel likely influenced the jury's
decision. [702-705]

This court did not discern any reason to reverse the jury's determination that
the defendant was criminally responsible for the murder at issue, and declined
to exercise its power to reduce the verdict or order a new trial. [705-706]

INDICTMENT found and returned in the Superior Court Department on September 11, 2003.

A motion to dismiss and a pretrial motion to suppress evidence were heard by *Timothy S. Hillman,* J.; the case was tried before *Francis R. Fecteau,* J., and a motion for a new trial, filed on March 14, 2006, and a motion to reconsider, filed on May 10, 2007, were considered by him.

*Greg T. Schubert* for the defendant.

*Donna-Marie Haran,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. Based on the brutal strangulation of a fellow inmate, the defendant was convicted of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. The defendant's pro se motion for a new trial, in which he asserted that his trial counsel furnished him with constitutionally ineffective representation, was denied by the trial judge without an evidentiary hearing. Represented by present appellate counsel, the defendant filed a motion for reconsideration, which the judge also denied. The defendant appeals from his conviction and from the denial of these posttrial motions. He argues error in the denial of his motions (1) to dismiss; (2) to suppress statements; (3) for a mistrial; (4) for a new trial; and (5) for reconsideration of the denial of his new trial motion. Because we conclude that there is no merit to the defendant's claims of error, and see no reason to exercise our power under G. L. c. 278, § 33E, we affirm the judgment of conviction, the order denying the motion for a new trial, and the order denying the motion for reconsideration.

*The trial.* We present the essential facts that the jury could have found based on the Commonwealth's evidence, reserving certain details for our discussion of the issues. On August 23, 2003, the defendant was serving a life sentence at the Souza-Baranowski Correctional Center, housed in a unit that provided protective housing for inmates who might be in danger in the general prison population.[1] The victim, John Geoghan, who had

---

[1]Jurors had been informed that the defendant was serving a life sentence, but not that it was because he had been convicted of murder in the first degree. The defendant's prior murder conviction was affirmed in *Commonwealth v. Smiledge,* 419 Mass. 156, 157 (1994). While incarcerated, the defendant has changed his name.

been convicted of child molestation he perpetrated while he was a Roman Catholic priest, was also housed in the unit. At approximately 11:53 A.M., only one of the two correction officers assigned to the unit was present. The inmates had finished lunch and the officer opened all of the cells electronically to collect the lunch trays.

We need not belabor the details of the killing, which came primarily from statements the defendant made to a correction officer and two State troopers on the day of the killing. It suffices to say that, before the correction officer closed the cell doors, the defendant entered the victim's cell; he had items he intended to use in the killing hidden on his person. He used a ruse to keep the victim calm and to get him to go to the back of his cell. When the door closed, the defendant jammed the door shut so that it could not be opened from the outside. He tied the victim's hands behind his back, threw him to the floor and "smashed his face on the ground." He strangled the victim, whose last words were, "It doesn't have to happen like this." The defendant responded, "Your days are over. No more children for you, pal."

Another inmate looked in the cell. The correction officer on duty was informed. The officer tried, unsuccessfully, to open the cell door. Other correction officers were summoned, and as they attempted to open the cell door, the defendant made statements to the effect that it was over, it was all set, and it was nothing against the officers. The defendant was pulled out of the cell "face first" across the floor, while a number of officers handcuffed him; he was led away to the hospital unit for an examination.

The defendant was boastful to both the correction officers and State troopers. On entering the room where he was to give his statement, he told one of the troopers that this "was going to make [your] career." Other witnesses said that, after the killing, while the defendant was in a holding cell on "eyeball watch,"[2] every time an officer looked in on him the defendant yelled, "I did it for the kids."

---

[2] "Eyeball watch" refers to a correction officer being physically present at the defendant's cell. This watch was a suicide watch. Another watch, discussed *infra*, was to ensure the defendant was protected from threats made against him.

In his statement to the troopers, the defendant said he had decided to kill the victim some five weeks before, after he overheard him talking about abusing children. He went into the victim's cell to talk to him so that when the defendant eventually went in to kill him, the victim would not be suspicious. The defendant chose August 23 because it was the weekend and involved an "eas[y] security breach." The defendant stated that he knew he would be held accountable, he had "really contemplated this," and his actions were "honorable." He told the troopers that they would find that the victim had a broken neck, broken back, and broken ribs.

The medical examiner testified that the sixty-eight year old victim died of strangulation. Blunt trauma to the chest, causing fourteen rib fractures, was a contributory cause of death. The medical examiner could not tell whether the ribs were broken before or after death, but stated that if the victim were conscious while they were being broken, it would have been painful.[3] He stated that the victim could have been conscious during the strangulation for ninety seconds or more.

We now summarize the defendant's case. Through the cross-examination of witnesses, the direct examination of his own lay and expert witnesses, and his own testimony, the defendant asserted that he was not criminally responsible under the standards set forth in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).

Defense counsel elicited, from witnesses for the Commonwealth, observations of the defendant's behavior right after the killing. On arrival at the hospital unit, he was crying. While he was having his wrist bandaged, he yelled that he did it and that the staff had better "check on the other guy, I'm fine." He was talking constantly, was agitated, excited, and boastful. He gave a statement to a correction officer and signed it "Rev. Druce." Later while in a holding cell, he continued his incessant talking, repeating that he had the responsibility to do it, he was not going to let the victim harm any other children, and he was the savior.

---

[3]The correction officer assigned to the unit at the time of the killing testified that he heard a thumping sound when he was informed that two inmates were in a cell. On cross-examination, the defendant admitted that he jumped on the victim.

Several days after the killing, while he was on "eyeball watch," the defendant swallowed two eight-inch pencils.

There was evidence that the defendant had had a troubled childhood marked by behavioral problems. When he was one and one-half years of age, the defendant would rock his crib over to a window and bang his head against it. The problems persisted after he entered school and, by age six, he was prescribed Thorazine and Ritalin in an attempt to control his behavior. Because of his behavioral difficulties, he received special education and eventually was placed in a residential program. In his teenage years the Department of Youth Services placed him in Danvers State Hospital.

Notably, during his childhood, the defendant was abused by his father and witnessed his father physically abusing his mother. After his parents separated, the defendant's father took him to bars and allowed him to drink alcohol. When the defendant was in his early teens, he met a man who was at least ten years older and who sexually abused him. In his teen years, the defendant also used illegal drugs.

Defense counsel elicited from the defendant details about his behavior and thoughts while he was in prison serving his life sentence. See note 1, *supra*. The defendant described his time in several penal institutions and his numerous trips to Bridgewater State Hospital for evaluation. He stated that whenever he felt he was in danger or was paranoid, or whenever there were orders he did not want to follow, he would engage in certain conduct to get out of the situation. He overdosed on medication, cut his arms, and inserted paper clips or other objects into his urethra. He ingested objects including a bed spring, chicken bones, and two metal straps from headphones, the latter two objects requiring surgery to remove. The defendant was sentenced to four years in a disciplinary unit at the State prison at Cedar Junction after he mailed a realistic-looking letter bomb to the office of the then Attorney General because the defendant had not received a response to letters he had sent concerning "new evidence" in his case.

The defendant also detailed elaborate fantasies he had while in prison. He fantasized that he was "Serpico." He kept written records of other fantasies, some of which included his becoming

very wealthy through the stock market, real estate, or winning the lottery.

The defendant founded his own ministry and church, in 2000, after a correspondence course. He designed a crest for his Church of the Chosen Ones, obtained a trademark and copyright, and wrote his own Bible. He fantasized that the Pope would make him "Saint Joseph." He stated that, before the killing, he wrote a document that was found in his cell; it stated that his mind was racing and he could not read or concentrate. He testified that this mental state commenced at the time he overheard the victim talking about a plan to abuse children by starting a mission in South America.[4] The defendant testified that he spoke to a prison deacon about his concerns and was told that the victim could start a ministry under any religion. The defendant could not get these concerns out of his mind. During a period in the disciplinary unit in the days preceding the killing, the defendant wrote a document that contained statements that the world wants to stop pedophilia, the victims of sexual abuse want justice, Saint Joseph would do it, and the Pope would be pleased.

On the day of the killing, the defendant had planned to enter the victim's cell earlier than he did, but there were too many inmates around. At first he thought that "God didn't want it to happen," but then the correction officer opened all the cell doors after lunch. The defendant fantasized that the Pope would give him absolution. The defendant testified that he saw himself as the individual designated, by a higher power, to put a stop to pedophilia. He stated that when he was killing the victim, he was thinking about his own abuse and the victim's arrogance.

The defendant presented expert testimony from Dr. Keith Ablow, a psychiatrist, who examined the defendant and reviewed the defendant's records from the Department of Youth Services, the Department of Social Services, the residential school program, other doctors, and the various correctional institutions to which the defendant had been sent. He explained a list of approximately twenty antipsychotic, antianxiety, and antidepressant medications, and a medication used for impulse control,

---

[4]Voir dire testimony of another inmate essentially confirmed that the victim did discuss his plan concerning a mission in South America, as well as details about how to abuse children.

that the defendant had been prescribed over the years, including while he was in prison. Dr. Ablow stated that the medications were very strong, especially because they often were used in combination. Dr. Ablow testified that the defendant suffered from severe psychiatric disorders from a young age, currently suffers from multiple mental illnesses, and that he had never seen a more ill person in his career.

Dr. Ablow identified the current mental illnesses as very severe attention deficit disorder; intermittent explosive disorder; a personality disorder, with elements of paranoid and antisocial personality disorder; and a dissociative disorder. These conditions are characterized by lack of ability to concentrate or focus, lack of impulse control, obsessive behavior, and becoming violent without substantial provocation.[5] Medications have not been successful in treating the defendant's behaviors. The defendant adopts various personas and uses fantasy because he is not tied to a particular identity that could anchor him; they allow him to lose himself. Because he is closed off from his feelings, the defendant cannot control them when they arise.

Dr. Ablow explained that being in the same area of the prison as the victim and hearing the victim discuss further abuse of children made it difficult for the defendant to distance himself from the memories of his own sexual abuse. Dr. Ablow concluded that because the defendant had been in solitary confinement just before the killing and had nothing else to distract him, he was unable to distance himself from his own rage. Dr. Ablow stated that the defendant was not sane, even though he was able to plan the killing, because the ability to plan and the ability to control the underlying rage that led him to it are two different things. Dr. Ablow concluded that because of the defendant's multiple mental illnesses, he lacked a substantial capacity to tell right from wrong and to conform his conduct to the law.

In rebuttal, the Commonwealth introduced two witnesses, Dr. Martin Kelly and Dr. Joseph A. Grillo. Dr. Kelly, a psychiatrist, testified that the defendant suffered from a personality disorder characterized by a lack of concern for others, repeated violations

---

[5]Dr. Ablow testified that the defendant also has polysubstance dependence, naming alcohol and a number of illegal drugs that the defendant had used "to blunt" some of his symptoms.

of social norms and the law, manipulation, deceit, assault, and excuse for his own behavior by stating that the victim deserved it. Dr. Kelly stated that it was clear that the defendant was able to appreciate the wrongfulness of his conduct because he chose the victim, and engaged in preparations for the killing that included bringing items into the victim's cell that the defendant used to jam the door and strangle the victim. In addition, Dr. Kelly stated that the fact that the defendant waited for an opportunity to act showed that he could conform his conduct to the law. Dr. Kelly further testified that the medications the defendant was taking at the time of the killing were for mental diseases or defects that would not disrupt the capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law.[6]

Dr. Grillo, a psychologist, had been at the prison on the day of the killing as part of a practicum in clinical psychology. While the defendant was in a cell, Dr. Grillo had talked to the defendant through a crack in the door to conduct a full mental status examination. The defendant, although agitated and tearful, denied having any hallucinations. In addition, the defendant told Dr. Grillo that he wanted everyone to know that the victim was planning to hurt more children, that the defendant had sacrificed himself, and that he wanted a trial so that the world would know that priests are not safe in prison.

*Discussion.* 1. *Motion to dismiss.*[7] In March, 2005, the defendant filed a motion to dismiss, alleging that the Department of Correction (department) interfered with his relationship with counsel and threatened him to coerce him to plead guilty, in violation of his State and Federal constitutional rights to counsel, due process, and a fair trial.[8] An evidentiary hearing was held, at which the defendant testified. The hearing on the motion to

---

[6]On cross-examination, Dr. Kelly stated that he was not assuming that Thorazine was prescribed for psychosis when the defendant was very young, because at that time the drug was used as a tranquilizer.

[7]One judge (motion judge) decided the defendant's motions to dismiss and to suppress his statements. A second judge (trial judge) presided at his trial and decided his motions for a mistrial, renewed motion to dismiss, and motion for a new trial.

[8]The defendant renewed the motion just before his second day of testimony, because an "eyeball watch" the department instituted for the defendant's protection from threats from other inmates resulted in his getting no sleep.

On the last day of jury deliberations, defense counsel called the judge's

dismiss was reopened when, in August, 2005, the Boston Herald published an article in which a reporter described, in detail, a videotape of the defendant allegedly reenacting the victim's killing. The photographs and videotape had never been seen by the defense and the defendant claimed that its timing (two years after the killing and just before a hearing on his motion to suppress) was another example of the department's attempt to interfere with his right to counsel and a fair trial. He also argued that the evidence was exculpatory because it highlighted his mental illness on the day of the killing. The motion judge found that the story "was accompanied by photographs from a videotape that could only have been taken at Souza-Baranowski's Health Services Unit shortly after the murder."

The defendant argues that the actions of the department were retributory because the killing of a high-profile victim triggered two investigations that were critical of the department. See note 12, *infra*. In his written decision, the motion judge concluded that, on the record before him, he would not dismiss the case. Concerning the videotape, he concluded that its prejudicial effects could best be handled through a jury voir dire. He noted that if the defendant's allegations that prison officials crossed a line could be substantiated, they could be addressed by a claim brought under the Federal or State civil rights act, and he admonished the department to cease hampering the defendant's efforts to prepare for his trial. There was no error.

The motion judge's decision set forth a litany of complaints the defendant had made against the department. He found that the attorney-client relationship had been impeded by department officials who refused to allow the defendant contact visits with defense counsel, instead separating them by a glass barrier that required them to speak over a telephone.[9] They also made it extremely difficult for the defendant to view a videotape of his

---

attention to the fact that the defendant had a visible wound to his face. The defendant claimed he was hit by a correction officer. Although defense counsel made reference to the incident as another example of the kind of harassment on which he based his motion to dismiss, he did not renew that motion. The judge asked the prosecutor to look into the matter.

[9] At a hearing on September 30, 2005, defense counsel reported that he was being allowed contact visits with the defendant.

extraction from the victim's cell by placing the television in another room and forcing the defendant to view the tape through a slit in the door ordinarily used to deliver food. In addition, prison officials were present in the outer room and were able to monitor what he was viewing.

The motion judge stated that the defendant also alleged that he was being harassed in a variety of ways, particularly because of the amount of negative publicity that the department received as a result of the victim's killing. This alleged harassment included having his cell "repeatedly and pretextually 'tossed,' " resulting in the removal of, or damage to, legal documents used in preparing his defense; trying to coerce him into pleading guilty; and deliberately placing the defendant's enemies on the same prison tier.

The motion judge stated that the defendant acted out in response. He swallowed two eight-inch pencils a short time after the killing because of his restricted contact with his attorney. After his transfer to a disciplinary unit, he "swallowed a coaxial cable and the stem from his eyeglasses" when he thought that his enemies were placed on the tier, in an "attempt to alert prison officials, and the outside world, to his situation, and to be placed in the health services unit, where he is presumably safer."[10]

Because of the publicity surrounding the victim's killing,[11] the motion judge noted that the department had a vested interest in seeing this case finished, concluding, "It does not take much imagination to see that this impetus, coupled with [the defendant's] allegations, make it troublingly possible that guards, officers, and/or administrators within the [department] are directing

[10]Although the motion judge does not mention this incident in his written decision, the defendant testified that he threatened the prison's superintendent when he was exposed to chemical agents that were dispersed near his cell that caused him pain and breathing problems. The threat resulted in the defendant being brought to a noncontact meeting with defense counsel by officers who were wearing full riot gear.

[11]The motion judge stated that two notable investigations resulted in reports, entitled "Administrative Investigation — the facts and circumstances surrounding the events, which led to Inmate John Geoghan's death on August 23, 2003" and "The Governor's Commission on Corrections Reform," that were "extremely critical" of the department and the prison leadership at Souza-Baranowski. The record shows that the judge accepted copies of these reports for review concerning the department's motive.

their actions against [the defendant], so as to force him to plead guilty. It is also readily apparent that [the defendant's] mental illness makes him an easy target for provocation." However, the motion judge also found that much of defense counsel's difficulties in preparing for trial resulted from the defendant's inability to focus the issues. He noted that the defendant was fixated on the department's treatment of him, and was a dangerous inmate who "presents a challenge to even the most seasoned prison administrator." He concluded, "Much of the [alleged conduct] is justified as being reasonably related to the penological interests of maintaining order, security, and safety in a prison." Although the motion judge found the "[o]ther allegations, namely that these restrictive and harassing actions taken against [the defendant] by prison officials are intended to influence [the defendant's] plea or compromising his defense are more serious," he nevertheless concluded that "the evidence falls short of proving that these actions have irreparably prejudiced [the defendant's] chances of receiving a fair trial."[12]

An intentional violation by government agents of a defendant's right to counsel and a fair trial could result in the dismissal of an indictment if it irremediably prejudices the defense. See *Commonwealth* v. *Fontaine*, 402 Mass. 491, 497 (1988). The Commonwealth bears the burden of proving that the defendant was not prejudiced by the misconduct. *Id.* at 495. There must be

---

[12]In his brief, the defendant also claims, inter alia, that his mail was misdelivered or stolen; prearranged telephone calls with his attorney were ended; he could have only noncontact visits with his investigator and expert; he was required to use inmate library workers to make copies of what he needed from the prison library, giving them access to his legal research; photocopied material he received by mail was restricted to five pages; he was told by department personnel that he should fire his attorney, and that his attorney was "playing games," which strained the attorney-client relationship (this was denied by the witness who, the defendant alleged, made the statements); and he was stabbed in the foot with a feces-covered spear. Although the motion judge did not address each of these allegations individually, many of which were supported by some evidence, the judge did not err in holding that there was not enough evidence to show that the incidents (that did not have a penological reason behind them) irreparably prejudiced the defendant.

The defendant also claimed that a paralegal who worked for the defense was barred from visiting him because she allegedly misrepresented her relationship with the defendant. The motion judge found that she had a personal and professional relationship with the defendant.

a showing that the improper conduct neither enhanced the Commonwealth's case nor weakened the defense. *Id.* However, this court has never ordered dismissal absent prejudice to the defendant. *Commonwealth* v. *King*, 400 Mass. 283, 290 (1987).

Here, although the motion judge clearly was concerned about some of the defendant's allegations, he properly found that, on the record before him, evidence of prejudice was insufficient to warrant a dismissal. The evidence against the defendant was overwhelming, where he was caught in the cell with the victim and even boasted about committing the killing. Further, the medical and physical evidence supported a determination that the victim was strangled and beaten, corroborating the defendant's own account of the killing. The only defense available to the defendant was lack of criminal responsibility. The defendant makes no claim that the noncontact visit rule impeded his expert's ability to formulate an opinion about the defendant's criminal responsibility. He also did not succumb to any alleged threats to plead guilty. In addition, the motion judge's finding that "much" of the difficulties in the attorney-client relationship was caused by the defendant's inability to focus on the issues, driven by his mental illness, is supported in the record. Moreover, there was no error in the motion judge's finding that the defendant was dangerous and that, therefore, much of the conduct about which the defendant complains was reasonably related to penological interests. See *Jiles* v. *Department of Correction*, 55 Mass. App. Ct. 658, 663 (2002), quoting *Bell* v. *Wolfish*, 441 U.S. 520, 546-547 (1979).

Finally, the one act that had the potential to prejudice the defendant's case, the newspaper article regarding the videotape where the defendant reenacted the killing, was remedied appropriately by the trial judge through a voir dire of prospective jurors. See *Commonwealth* v. *King*, *supra* at 291-292. See also *Commonwealth* v. *Cronk*, 396 Mass. 194, 199 (1985). As the motion judge noted, courts do not readily change venues in response to pretrial publicity, let alone take the more drastic step of dismissing the indictment. The remedy here was adequate. See *Commonwealth* v. *Clark*, 432 Mass. 1, 5-6 (2000), and cases cited.[13]

2. *Motion to suppress.* On the day of the killing, after he

[13]During trial, the defendant renewed his motion to dismiss based on the

received Miranda warnings, the defendant gave two statements to law enforcement officers. He first spoke to Correctional Officer Edward T. Hammond, who saw the defendant about thirty minutes after his arrival at the hospital unit. At 4:45 P.M., the defendant gave a statement to State troopers. The defendant moved to suppress these statements on grounds that his waiver of his State and Federal constitutional rights was not knowing, intelligent, and voluntary, because he was suffering from mental illness and was subject to physical and mental coercion.[14] On appeal, the defendant argues that the motion judge abused his discretion in denying the motion because a correction officer asked the defendant, "Why did you do it?" in order "to elicit a statement" before he received the Miranda warnings, and that the defendant's physical and mental state at the time of his statements, as well as evidence of his mental illness, made it impossible for him to make a voluntary statement and to control his actions or appreciate right from wrong. There was no error.

Concerning whether a correction officer asked the defendant why he did it, the testimony was inconsistent. At the evidentiary hearing on the motion, Officer Hammond testified that he went to the hospital unit, asked one of the other correction officers what was going on, and the defendant "starting making spontaneous statements as far as 'I killed that child molester,' you know, 'He was going to rape kids when he got out.' " Hammond testified that he told the defendant, "Hold on. I need to Mirandize you." Within a few days, Hammond memorialized the entire encounter he had with the defendant, including the defendant's statements before and after the defendant received his Miranda warnings.

However, one of the correction officers who escorted the defendant from the cell block to the hospital unit, Officer Travis Canty, stated that he heard another of the officers escorting the defendant ask, "Why did you do it?" Canty testified that he did not ask the question and stated that he did not know who did.

---

department's conduct, which also was denied by the trial judge. Because the issues overlap, we address the defendant's claim that he did not sleep before his second day of testimony in our discussion of the defendant's motions for a mistrial.

[14]On appeal, the defendant does not raise the issue of physical coercion.

Canty testified that the question resulted in the defendant's describing, before Hammond arrived, how he planned and executed the killing.

In his written memorandum of decision, the motion judge specifically found that the defendant "without any prodding voluntarily blurted out that 'I killed that child molester. He was going to kill kids.' . . . Similarly, [the defendant's] statements made in the presence of Officer Canty were made spontaneously while correction officials were assessing [the defendant's] physical condition in [the hospital unit] and while awaiting . . . Hammond." Officer Canty's statement that he heard someone ask the defendant why he did it was implicitly rejected by the motion judge when he concluded that there was "no evidence that [the defendant] was subject to any questioning or any other conduct designed to elicit an incriminating response." It is a motion judge's function and responsibility to assess the weight and credibility of testimony. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). We accept a judge's resolution of conflicting testimony. *Commonwealth* v. *Yesilciman, supra*, quoting *Commonwealth* v. *Spagnolo*, 17 Mass. App. Ct. 516, 517-518 (1984).

We also see no merit to the defendant's claim that, contrary to the conclusion of the motion judge, the defendant's waiver of his Miranda rights and subsequent statement were not, and could not be, voluntary, because of the state he was in the day of the killing and because of his mental illness.[15]

The Commonwealth must prove, beyond a reasonable doubt, based on the totality of the circumstances, that a defendant voluntarily, knowingly, and intelligently waived his rights and made his statement voluntarily. *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000), and cases cited. Where there is a claim of mental illness, the Commonwealth must show that the waiver was knowing, intelligent and voluntary, "notwithstanding [that] mental illness." *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 99-100

---

[15]At the motion to suppress hearing, the defendant did not call an expert to testify about his mental illness. He relies on trial testimony to support his argument of involuntariness and we do not consider it. *Commonwealth* v. *Rivera*, 441 Mass. 358, 367 (2004), quoting *Commonwealth* v. *Ramos*, 402 Mass. 209, 216 (1988).

(2004), and cases cited. See *Commonwealth* v. *Beland,* 436 Mass. 273, 282 (2002) (waiver and statements voluntary, where defendant with bipolar disorder alert and calm, and confessions were in chronological order). Cf. *Commonwealth* v. *Vazquez,* 387 Mass. 96, 100 n.8 (1982) (court will exclude statements if mental illness renders person incapable of understanding consequences of confession or indifferent to self-protection). Moreover, emotional upset alone does not render a statement made after waiver of Miranda rights "invalid where there is no evidence that the defendant was acting irrationally." *Commonwealth* v. *Auclair,* 444 Mass. 348, 355 (2005), citing *Commonwealth* v. *LeBlanc,* 433 Mass. 549, 555 (2001).

The motion judge acknowledged that the defendant was mentally disturbed and emotional. Nevertheless, he found that the defendant was "coherent, albeit very agitated, responsive, rational, and able to recall facts in detail," that he was "self-aware, aware of his surroundings, the people around him and their respective roles," that he was not under any lengthy, systematic, and coercive pressures, and that he "volunteered many of his statements without any questions being asked." These findings are fully supported in the record. The motion judge did not err when he concluded that the defendant was capable of understanding the consequences of his waiver, sufficiently in control of his faculties, and able voluntarily to waive his Miranda rights and make voluntary statements. *Commonwealth* v. *Beland, supra* at 279 (no error where judge's findings were fully supported in record and law was correctly applied).

3. *Motion for a mistrial.* The defendant argues that the trial judge abused his discretion in denying his oral motion for a mistrial based on the department's conduct: inadequately medicating the defendant during his trial, and harassing him by taking his papers away and conducting a strip search. The defendant argues that, because he is mentally ill and easily upset, the department's conduct was particularly egregious. Defense counsel renewed the motion when, because of an "eyeball watch," the defendant did not sleep the night before his second day of testimony.[16] See note 14, *supra.*

---

[16]On appeal, the defendant argues that the Boston Herald article also was grounds for a mistrial. This claim adds nothing to the discussion we have set forth in addressing the denial of the defendant's motions to dismiss.

The decision to declare a mistrial is within the trial judge's discretion. *Commonwealth* v. *Bryant*, 447 Mass. 494, 503 (2006). The defendant bears a heavy burden of proving that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Commonwealth* v. *Jaime*, 433 Mass. 575, 579 (2001), quoting *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985). The defendant has not met his burden.

Concerning the medications, as soon as the defendant's discomfort was brought to the attention of the trial judge, he made sure that the defendant received his medications. He also abbreviated the trial at least once to accommodate the defendant's lack of control over his behavior. Subjecting the defendant to a strip search and searching trial related papers he was carrying was the result of information that court officers received that the defendant had a weapon.[17] The judge was informed of the security issues and monitored the search, by looking in on the officers. The judge stated that he was certain that the defendant's trial papers had not been read and that the officers were respectful of the defendant. We also note that the judge issued an order granting the defendant's oral motion to remain in the presence of his papers while they were screened for security reasons.

The judge also found no basis for a mistrial when the defendant did not sleep the night before his second day of testimony due to an "eyeball watch." After the defendant testified, the defendant also based a renewed motion to dismiss on this lack of sleep. The judge denied the motion, stating that he saw no ill effects from the lack of sleep, and observing that the defendant was responsive and coherent, had a good grasp of details and facts, and testified as well as he had on his first day of testimony.

On the second day of jury deliberations, when the defendant arrived in court with bruising and swelling around his eye, he blurted out, in the presence of the jury, "That's what the [department] did." Outside the presence of the jury, he told the judge that a correction officer "cuffed" him in his chest and then "blasted" him in the face. He also claimed that his television was smashed and his watch stolen. Defense counsel argued that it was

[17]The defendant denied making the statement that caused the concern, claiming that department personnel fabricated it.

another example of the kind of harassment to which the defendant was subject. The judge asked the prosecutor to investigate.[18] Defense counsel did not renew his motion for a mistrial at that time, but on appeal, the defendant argues that this event, coupled with all of the other things that happened during the trial, constitutes a mistrial. The defendant has failed to show how this prejudiced his trial, especially because he used the injury to inform the jury of his abuse at the hands of the department.

In all of these instances, we cannot say that the judge erred in concluding that there was no prejudice to the defendant to warrant a mistrial.

4. *Motion for a new trial.* In 2006, the defendant filed a pro se motion for a new trial, claiming ineffective assistance of trial counsel. He also filed a motion to enlarge his motion for a new trial. Without an evidentiary hearing, the judge denied his motions. Represented by present appellate counsel, the defendant filed a motion to reconsider his motion for a new trial, which also was denied.[19]

The judge (who, as previously noted, was the trial judge) correctly stated that, of the defendant's numerous allegations concerning his trial counsel, only one is material to the defendant's trial: that his counsel was ineffective because he failed to intro-

---

[18]There is nothing in the record indicating the results of this investigation.

[19]We denied the defendant's motion to argue his appeal before this court pro se and to discharge his present appellate counsel for bias. The defendant's charges against his appellate counsel are that counsel would not present certain allegations to us, but we note that those allegations are addressed in his motions for a new trial. The defendant filed the motion to discharge his appellate counsel a second time, as well as two documents objecting to our denial of his first motion to argue his appeal. We treat these documents as motions for reconsideration. They are denied.

We note, however, that in his pro se postargument letter to this court the defendant again asked us to allow him to argue his case and "prove [his] claims" on the "real issues." To the extent that the defendant requests to argue the issues presented in this appeal, that request is denied as moot. To the extent that the defendant is asserting that the "real issues" are that more people were involved in the killing, we have addressed that claim, see note 22, *infra.* To the extent he is asserting mistreatment by the department and its employees, we agree with the motion judge who decided the defendant's motion to dismiss. If the defendant could substantiate his claims, they could be addressed by a claim brought under the Federal or State civil rights act.

duce certain evidence through witnesses and documents.[20] The defendant argues that the trial judge abused his discretion in denying the pro se motion for a new trial and motion for reconsideration.

A defendant who seeks a new trial based on ineffective assistance of counsel bears the burden of proving the ineffectiveness. *Commonwealth* v. *Comita*, 441 Mass. 86, 90 (2004). Where the appeal from the denial of a motion for a new trial based on ineffective assistance is raised in a direct appeal, we review "to determine whether any substantial conduct or omission by counsel 'was likely to have influenced the jury's conclusion.' " *Commonwealth* v. *Montez*, 450 Mass. 736, 754 (2008), quoting *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). See *Commonwealth* v. *Martin*, 427 Mass. 816, 817-818 n.2 (1998), citing *Commonwealth* v. *Wright*, *supra* (if error likely influenced result of trial it creates substantial likelihood of miscarriage of justice). Whether to call a witness is a strategic decision and such decisions are ineffective assistance "only if was manifestly unreasonable when made." *Commonwealth* v. *Montez*, *supra*, quoting *Commonwealth* v. *Martin*, *supra* at 822.

The defendant has not met his burden of showing that substantial conduct or omission by his counsel likely influenced the jury's decision. As the judge stated in his written decision, the

---

[20]The defendant also alleged that there was a conflict of interest between the defendant and his attorney concerning the attorney's employment of a paralegal assistant, see note 12, *supra*, against whom the defendant made various complaints, and that the attorney represented this assistant and another party unrelated to this case in another matter.

It appears that the defendant also filed a complaint against his trial counsel with the Board of Bar Overseers (board), making essentially the same allegations he made in his motion for a new trial. The appendix the defendant submitted with his motion for reconsideration, discussed *infra*, contains a portion of trial counsel's response to the defendant's allegations, as well as a letter from the board to the defendant stating that bar counsel properly closed its file on the attorney. We note that, in his response to bar counsel's investigation, trial counsel stated that the defendant had given him permission to represent the paralegal assistant and that the defendant's other charges concerning her were related to the defendant's disappointment that the personal relationship he had with her had ended. In his pro se motion for a new trial, the defendant refers to her as his former fiancée. The judge's written decision was issued before the defendant submitted these documents. It is not clear whether the judge read the documents when he denied the motion for reconsideration. We have reviewed them as part of our plenary review of the defendant's conviction.

defense in this case was lack of criminal responsibility. The evidence that the defendant was guilty of the murder was overwhelming, even apart from his statements, "to anyone and everyone" who would listen, that he did it and was proud of it. The defendant was the only one in the victim's cell; he had jammed the door shut; the victim was lying on the floor with a ligature around his neck that was made in part with the defendant's own articles of clothing. The defendant claims "that additional evidence should have been adduced from correction department officers and officials, as well as through or by a post-death investigation conducted by an ad hoc commission." See note 12, *supra.* We agree with the judge that "[w]ith the exception of his complaint that his attorney failed to introduce records or call other witnesses who may have offered testimony about his psychiatric history, none of his other complaints . . . have any relevance to the issues material to the trial of this case."[21] Moreover, as the judge stated, the defendant, his parents, and expert "were given wide latitude in their testimony concerning his past social and psychiatric history, which history was largely uncontested by the Commonwealth. . . . His expert was permitted to testify without limitation, to the defendant's history and the contents of any and all records of past psychological placements, examinations, observations, and diagnoses . . . for support of his opinion testimony concerning the mental state of the defendant on the day of the offense." The judge's conclusion that the evidence material to his defense that the defendant claims should have been offered is cumulative or speculative is supported in the record. There was no abuse of discretion. See *Commonwealth* v. *Diaz,* 448 Mass. 286, 289 (2007), quoting *Commonwealth* v. *Scott,* 428 Mass. 362, 369 (1998); *Commonwealth* v. *Benson,*

---

[21]As discussed, after the trial judge issued his written decision, the defendant submitted an appendix that he claimed supported the allegations in his motion and affidavit. The documents add nothing because the defendant does not explain how the documents that are material to his defense are not cumulative or speculative. Indeed, as noted, his trial counsel wrote a response to an investigation by bar counsel stating the reasons documents were not submitted and witnesses were not called. For example, counsel explains that records from Bridgewater State Hospital that were referred to by the defendant's expert contained psychiatric information that could have harmed the defense of lack of criminal responsibility.

*ante* 90, 99 (2009), quoting *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986).

5. *Review pursuant to G. L. c. 278, § 33E.* In his brief, the defendant requested that we exercise our power pursuant to G. L. c. 278, § 33E, to enter a verdict of not guilty because of a lack of criminal responsibility, reduce the verdict to manslaughter, or order a new trial. The defendant then filed a pro se motion requesting that we not review his conviction pursuant to G. L. c. 278, § 33E, because "trial counsel duped [the] defendant on the insanity defense that made the defendant the sole scapegoat, when others are involved."[22] Present appellate counsel had written a letter to the court, in April, 2008, stating the defendant's request, and he reiterated at oral argument that the defendant does not "want any such relief that would suggest in any way, shape or form that he is suffering from a mental defect. And that he would . . . hope that this court would not in any way give relief based upon anything that would determine that he would have a mental defect."

Although it is doubtful that, in view of the circumstances in this case, the defendant is able to waive plenary review, see *Commonwealth* v. *Brito*, 402 Mass. 761, 762 n.1 (1988), we need not belabor the waiver issue because we do not discern any reason to reverse the jury's determination that the defendant was criminally responsible for this murder. Here, the Commonwealth and the defense called their own experts who presented their opinions concerning the defendant's state of mind at the time of the killing, and who were thoroughly cross-examined. The jury were warranted in rejecting the defense of lack of criminal responsibility. *Id.* Contrast *Commonwealth* v. *Mutina*, 366 Mass. 810, 816 (1975) (new trial ordered where prosecution presented no affirmative evidence of defendant's sanity and defendant pre-

---

[22]The defendant had testified at trial that the correction officer covering the unit on the day of the killing knowingly allowed him to go into the victim's cell. He stated that the officer thought that the defendant simply was going to beat the victim. In his statement to the court before sentencing, the defendant spoke about errors that were contained in the government reports issued as a result of this killing. See note 11, *supra.* In the documents he submitted with his motion for reconsideration of his motion for a new trial, the defendant spends much time explaining his theory of how he was used by the department. These charges, even if true, are not material to the defendant's guilt in the victim's murder.

sented strong evidence of lack of criminal responsibility); *Commonwealth* v. *Cox*, 327 Mass. 609, 615 (1951) (same).

We have considered the entire trial record and discern no reason to exercise our power under G. L. c. 278, § 33E.[23]

*Conclusion.* For the reasons set forth above, we affirm the defendant's conviction and the denial of his motion and renewed motion for a new trial.

*So ordered.*

---

[23]We are in receipt of the defendant's submissions dated March 22 and March 31, 2009. The defendant submitted, with the latter, supplemental documents in this appeal, stating that his appellate attorney refused to file them with, and argue them before, this court. We have considered them as part of our plenary review of the case.